# Mortgage Audit Report Deluxe Extended II

with Comments on Securitization,
the Chain of Title & Foreclosure

for

## Ivan Higgs

54248 Kalberer Rd., Scappoose OR 97056

## Introduction

A securitization audit is an examination of the documents presented for a particular loan and security transaction and comparing and analyzing them with other available information for the purpose of determining if it has been securitized, and if it was, of identifying the securitizing entity.

The examination also involves a review of the documents presented as they relate to the various other transactions, topics and issues affecting securitizations in general and the audited loan in particular. These include the servicer's response or failure to respond to the borrower's request for information or Qualified Written Request (QWR) under 12 USC § 2605 or similar laws, the lender's compliance of the disclosures required before and during the granting of the loan under the Truth in Lending Act (TILA) and the Real Estate Settlement Procedures Act (RESPA), the standards employed in qualifying the borrower (more specifically, the Debt-to-Income Ratio and the Loan-to-Value Ratio), the role of MERS, robo-signing, the chain of title and foreclosure. Where applicable, each of these issues is discussed in their respective sections in this report.

Generally, the basic documents to be presented for this type of examination are the promissory note and the security instrument, *i.e.,* the mortgage, or deed of trust or security deed. Other relevant documents include allonges, assignments, documents pertaining to foreclosure and the MERS servicer inquiry screenshot. Collateral documents include the pre-closing documents such as the loan application, the Federal TIL Disclosure Statement, appraisal report and similar documents, liens search report or title report, mortgage loan statements and letters from the servicer and other correspondence.

Where applicable the examiner utilizes the facilities of ABSNet® for locating a loan in a particular trust and for obtaining information pertaining to the securitization, the Securities and Exchange Commission database at www.secinfo.com for the various documents that were filed by the trust and various other on-line sites that host resources on law and jurisprudence, legal definitions and procedures, robo-signing and various other information relevant to the issues at hand.

A loan is securitized by its holder. Although a loan may have been granted by a private lending institution, it may qualify for funding by a Government-Sponsored Enterprise (GSE) such as the Federal National Mortgage Association (FNMA or Fannie Mae) or Federal Home Loan Mortgage Corp. (FHLMC or Freddie Mac) whereupon it is sold or transferred by the

originating private lender to any of these institutions. If this has been the case for the loan under examination, the examiners will then conclude that it is now owned by a GSE.

On the other hand, a majority of home mortgage loans do not qualify for funding by these GSEs and their ownership remain with the originating lender. These private lenders also securitized their loans and they are referred as "private label" securitizations. The loan that is the subject of this examination should fall under this category or the examiner will conclude that it has not been securitized into a private label trust. For various reasons not all loans that failed to qualify for funding by GSEs were securitized into private label trusts. In other words, this examination puts great emphasis on the evidence that the loan has been securitized otherwise the examiner will not make that conclusion.

Whether or not the examined loan was found to have been owned by a GSE or was not securitized into a private label trust, the examination will still cover the various other issues affecting the loan and security such as the loan qualifying standards, disclosures, the role of MERS, robo-signing, the chain of title and foreclosure, where applicable. In short, the findings will generally bear down upon the chain of title which includes identifying the current holder or holders of the debt and the security instruments and the standing of the foreclosing entity to foreclose.

If the loan has been securitized and there are documents to support an analysis, the examiner will also present a computation in approximate terms the gross profit that the trust would have made from securitizing the subject loan and the time it took for the originating lender to recover from the trust the amount it lent to the borrower thereby replenishing its funds for fresh lending.

The examiner has no interest in the outcome of this examination and will perform his task in the highest degree of professional integrity.  All his decisions are exercised with due care and diligence and his conclusions are based on the documents presented coupled with information gathered from the most reliable sources that are available. Where necessary, the sources of these information are cited in this report.

## Purposes of the Examination

The purposes of this examination are as follows:

- The QWR and QWR Response. To establish the facts that a Qualified Written Request has been sent to the loan servicer on a certain date prior to this examination and that the servicer has responded to it on a certain date and to determine the disputations and requests for information that were manifested by the borrower in the request and the manner and extent to which they were handled and covered by the servicer in its response.

- The Loan and the Security. To establish the existence of the loan and the underlying security as agreed upon and acknowledged by the parties based on the documents presented, to identify the mortgaged property and to determine their terms and conditions. The documents are reviewed in order to determine if the lender complied with the disclosures required under the TILA and the RESPA. The debt-to-income ratio of the borrower and the loan-to-value ratio of the property are also computed in order to determine if these are within prescribed limits or if there are indications of predatory lending practices. This section also touches on the status and issues regarding loan servicing.

- Robo-Signing. To establish prima facie evidence that the persons who signed on behalf of the entities who have executed acts involving this loan and security, the witnesses to their signing, as well as the notaries public, have been involved in robo-signing or surrogate signing. This includes a comparison of their signatures with available specimens that could be obtained from various reliable sources including the examiner's own compilation.

- The Role of MERS. If Mortgage Electronic Registration Systems, Inc. (MERS) is a party in the debt and/or the security instruments, to determine what authority or capacity has been granted to MERS and by whom, and if MERS did perform any act under that capacity, to determine if this act was performed in accordance with law and/or the terms and conditions under which they were bestowed.

- The Securitization. To determine if the subject loan has been securitized and if it was, to establish that the securitizing entity exists or once existed, to identify the parties thereto, to verify if the required chains of endorsements of the promissory note and assignments of the security instrument have been fully complied with, to review and assess the effect of securitization on the loan, to determine its present status as a securitized loan and to identify the entity who has possession of the loan and security instruments.

- Profit on the Securitized Loan. To determine, albeit in theoretical terms, the potential or actual income that the securitizing entity will derive or has derived from the securitization of the loan as well as the period of time it took for the originating lender to recover from the securitization trust the amount it loaned to the borrower.

- The Chain of Title. To identify any breaks in the chain of title or instances wherein the security instrument has been separated from the debt instrument in relation to the securitization of the loan, the capacity or lack thereof, of MERS to perform certain acts and the nullity of the documents that have been signed by forgers or robo-signers or surrogate signers based on the prima facie evidence that have been gathered.

- Foreclosure. To identify any flaws in the transactions leading to and relating to foreclosure in order to determine if the foreclosing entity has the standing to foreclose and can show evidence, upon demand, that it has physical possession of the note and the security instrument as well as the documents evidencing the chains of valid endorsements and assignments ending it its favor at the time of the filing of the complaint.

## The Documents Presented for Examination

The documents that were presented and which were considered in this examination are enumerated and described below. Sufficient effort has been exerted in obtaining these documents in order to ensure that they are complete and reflect the true state of the loan and the underlying security as of the date of examination. The examiner has added additional documents to support his findings and these are accordingly described as such.

Where, in spite of these efforts some documents could not be obtained, the examiner may not be able to attain the purpose or purposes of the examination for which these documents could have been made the bases, and thus, the examination will not cover these phases and no conclusion could be arrived at for them.

The examiner warrants that these documents were in the same state when they were examined as when they first came into his possession. In spite of the deficiencies as may be noted herein, the documents are treated as true and correct copies of their originals.

The documents are herein listed as exhibits, as follows:

- Loan related documents and or information

# The Debt & the Security Instruments

## The Debt Instrument

The Mortgage that was executed on June 26, 2017 states that it secures a loan evidenced by a note of even date. The parties are Ivan Higgs, the borrowers and LoanStar Home Loans, LLC DBA LoanStar Home Lending, the originating lender.

> Promissory Note
>
> A promissory note is a written promise to pay a debt. It is an unconditional promise to pay on demand or at a fixed or determined future time a particular sum of money to or to the order of a specified person or to the bearer. Promissory Notes, Law and Legal Definition, Retrieved August 25, 2014, from http://definitions.uslegal.com/p/promissory-notes/
>
> Parties in a Promissory Note
>
> The parties in a promissory note are basically the maker and the payee. The maker is person who makes the note and undertakes to pay the amount stated in the promissory note. The payee is the person to whom the amount is payable under the promissory note.
>
> Subsequent parties, if any, are the holder, the endorser, and the endorsee. The holder is the person who may be the payee or endorsee of the promissory note. The holder is the person who is entitled to possession of the instrument in his own name and is also entitled to receive the amount due under the promissory note. The endorser is the person who, by endorsement, transfers the promissory note to another person. The endorsee is the person to whom the promissory note is transferred by endorsement. Parties to Promissory Notes, Bills, & Checks, Retrieved August 25, 2014, from http://www.myedupages.com/all-topics/89-banking-laws-practices/parties-to-promissory-notes-bills-and-cheques/162-parties-to-promissory-notes-bills-and-cheques

Endorsement

Endorsement is the act of the owner or payee signing his/her name on the back of a check, bill of exchange or other negotiable instrument so as to make it payable to another or cashable by another person.

An endorsement in blank is also known as general endorsement. It specifies no particular endorsee and thereafter is payable to bearer and may be negotiated by delivery alone. An endorsement in blank is an unqualified endorsement, and thus the endorser thereof makes all warranties to all subsequent holders in due course specified in Section 3-417, Uniform Commercial Code. Endorsement, Law and Legal Definition, Retrieved & *abridged*, August 25, 2014, from http://definitions.uslegal.com/e/endorsement/

Promissory Note, Governing Law

In the United States, the law governing negotiable instruments in general and promissory notes in particular is Article 3 of the Uniform Commercial Code. UCC Article 3 – Negotiable Instruments, Legal Information Institute, Retrieved August 25, 2014, from http://www.law.cornell.edu/ucc/3

## The Mortgage

The Mortgage was executed on June 26, 2017. The parties are Ivan Higgs and LoanStar Home Loans, LLC DBA LoanStar Home Lending, the originating lender and grantee (or mortgagee). This instrument secures the debt of the borrowers to the lender including interest thereof.

The mortgaged property is located at 54248 Kalberer Rd., Scappoose OR 97056.

> Mortgage
>
> A mortgage is a legal document by which the owner transfers to the lender an interest in real estate to secure the repayment of a debt, evidenced by a mortgage note. When the debt is repaid, the mortgage is discharged, and a satisfaction of mortgage is recorded with the register of deeds in the county where the mortgage was recorded. West's Encyclopaedia of American Law. Mortgage, Retrieved August 25, 2014, from http://legal-dictionary.thefreedictionary.com/mortgage
>
> Parties in a Mortgage
>
> The party who borrows the money and gives the mortgage (the debtor) is the mortgagor; the party who pays the money and receives the mortgage (the lender) is the mortgagee. The mortgage must be executed according to the formalities required by the laws of the state where the property is located. It must describe the real estate and must be signed by all owners, including non-owner spouses if the property is a homestead. Some states require witnesses as well as acknowledgement before a Notary Public.
>
> The mortgage note, in which the borrower promises to repay the debt, sets out the terms of the transaction: the amount of the debt, the mortgage due date, the rate of interest, the amount of monthly payments, whether the lender requires monthly payments to build a tax and insurance reserve, whether the loan may be repaid with larger or more frequent payments without a prepayment penalty, and whether failing to make a payment or selling the property will entitle the lender to call the entire debt due. West's Encyclopaedia of American Law, Mortgage, Retrieved August 25, 2014, from http://legal-dictionary.thefreedictionary.com/mortgage

Security Interest

A security interest arises when, in exchange for a loan, a borrower agrees in a security agreement that the lender (the secured party) may take specified collateral owned by the borrower if he or she should default on the loan. Secured Transaction Law: An Overview, Retrieved August 25, 2014, from http://www.law.cornell.edu/wex/secured_transactions

Secured Transaction

A secured transaction is defined as any loan or credit in which property is pledged as security in the event payment is not made. Hill, G. and Hill, K. Secured Transaction, Retrieved August 25, 2014, from http://legal-dictionary.thefreedictionary.com/secured+transaction

Mortgage, Governing Law

In the United States, the law governing secured transactions in general and mortgages in particular is Article 9 of the Uniform Commercial Code. UCC Article 9 – Secured Transactions, Retrieved August 25, 2014 from http://www.law.cornell.edu/ucc/9

## Information on the Debt & the Security Instruments

| | | |
|---|---|---|
| General | Principal Amount | $ 414,000 |
| | Date Granted | June 26, 2017 |
| The Debt Instrument | Type of Document | Promissory Note |
| The Security Instrument | Type of Document | Mortgage |
| | Date Executed | June 26, 2017 |

## Parties in the Debt & the Security Instruments

| | | |
|---|---|---|
| Grantors | Name | Ivan Higgs |
| | Mailing Address | 54248 Kalberer Rd., Scappoose OR 97056 |
| | Property Address | 54248 Kalberer Rd., Scappoose OR 97056 |
| Borrower(s) | Name | Ivan Higgs |
| Lender | Name | LoanStar Home Loans, LLC DBA LoanStar Home Lending |
| Loan Servicer | Name | LoanStar Home Loans, LLC DBA LoanStar Home Lending |

## About the Servicer

There being no document that was presented in this examination which shows the contrary, it is herein assumed that the subject loan is serviced by LoanStar Home Loans, LLC DBA LoanStar Home Lending, the originating lender.

> Loan Servicer
>
> A loan servicer is a financial institution which reports loan payments, collects monthly payments and penalties on late payment, releases liens, makes certain that insurance and taxes are paid and initiates foreclosure proceedings for loans in default. A loan servicer is also called a mortgage servicer. A loan servicer can also be the lender who owns the loan. Loan Servicer Law & Legal Definition, Retrieved August 25, 2014 from http://definitions.uslegal.com/l/loan-servicer/

## Examiner's Comments

### The Promissory Note

The subject loan exists according to the amount, interest rate, maturity date and the terms and conditions stated in the promissory note which is assumed to have been signed by the borrowers. It could not be ascertained if this note has not been endorsed.

The promissory note, the parties thereto and its terms and conditions fall within the cited definitions, as applicable, and is considered to be governed under the applicable laws.

### The Mortgage

The Mortgage exists as a security on the subject loan according to the amount, maturity date, property address, and the terms and conditions stated in the mentioned deed which is signed by the borrowers and the notarizing official. It represents a first lien on the title of the mortgaged property and is recorded in the county where the property belongs.

The subject Mortgage, the parties thereto, and its terms and conditions fall within the cited definitions, as applicable, and is considered to be governed under the applicable laws.

# Robo-Signing

## History

In the mortgage industry, robo-signing is the practice of an employee signing thousands of documents and affidavits without verifying the information contained therein. Some reports have revealed that one bank official signed off on almost 10,000 documents in one month. The practice calls into question the validity of thousands of mortgage assignments and foreclosures across the country.

Banks have been under investigation since 2010 for their part in the robo-signing scandal which resulted in many homeowners losing their homes without merit. After the scandal came to light, the banks said they would no longer engage in this practice. However, as recently as July 2011, it was discovered that mortgage robo-signing was still being practiced.

When the practice recently came to light, four major banks, JP Morgan Chase, Ally Financial/GMAC, Bank of America, and Wells Fargo all called a halt to foreclosure actions in 23 states. In the days following their announcements, Bank of America ceased foreclosures in all 50 states. A coalition of 40 attorneys general plan on launching a probe into mortgage-servicing practices and may hold them accountable where there were violations of state foreclosure laws. Phillips Garcia Law, What is Robo-Signing, Retrieved August 25, 2014 from http://www.southcoastaccidentattorney.com/faqs/what-is-robosigningnbsp.cfm

> Robo-Signer
>
> A robo-signer is a person in a legal document processing assembly line whose only task is to sign previously-prepared documents affecting title to real property in a robotic-like fashion without reading the documents or verifying the facts contained therein by reviewing primary source evidence. The robo-signer's mission is to expedite the documents' recordation in the public land records or in court proceedings. Additionally, robo signers regularly fail to establish or simply do not have the authority to execute these documents on behalf of the legal title holder or principal on whose behalf they purport to act.

Surrogate Signer

A surrogate signer is a person who signs a legal document on behalf of and in the name of another without reading it or understanding the document's contents. Surrogate signers are not authorized to execute these documents on behalf of the legal title holder or principal on whose behalf they purport to act.

Robo-Signing is Forgery

Forgery is the creation of a false written document or alteration of a genuine one, with the intent to defraud. Forgery consists of filling in blanks on a document containing a genuine signature, or materially altering or erasing an existing instrument. An underlying intent to defraud, based on knowledge of the false nature of the instrument, must accompany the act. Hill, G. and Hill, K. Forgery, Retrieved August 25, 2014, from http://legal-dictionary.thefreedictionary.com/forgery

Forgery is a Felony

"This is the first time any grand jury in the country has indicted a corporation or a high-level executive at a corporation for 'robo-signing,'" Missouri Attorney General Chris Koster told The Huffington Post. "The grand jury is alleging that the documents have false signatures on them, that the notarizations are fraudulent and that it was all done with intent to deceive. If that's true, it makes the [foreclosure] documents forgeries." Levine, D.M., In DocX Case, Robo-Signing Forgery Charge Hits Top Executive, Retrieved August 25, 2014 from http://www.huffingtonpost.com/2012/02/07/robo-signing-docx-missouri_n_1261369.html

Perjury

A crime that occurs when an individual willfully makes a false statement during a judicial proceeding, after he or she has taken an oath to speak the truth.

The common-law crime of perjury is now governed by both state and federal laws. In addition, the Model Penal Code, which has been adopted in some form by many states and promulgated by the Commission on Uniform State Laws, also sets forth the following basic elements for the crime of perjury: (1) a false statement is made under oath or equivalent affirmation during a judicial proceeding; (2) the statement must be material or relevant to the proceeding; and (3) the witness must have the Specific Intent to deceive. Perjury; Legal Dictionary, Retrieved November 14, 2015. http://legal-dictionary.thefreedictionary.com/perjury

Fraud

A false representation of a matter of fact – whether by words or by conduct, by false or misleading allegations, or by concealment of what should have been disclosed – that deceives and is intended to deceive another so that the individual will act upon it to her or his legal injury.

Fraud is commonly understood as dishonesty calculated for advantage. A person who is dishonest may be called a fraud. In the U.S. legal system, fraud is a specific offense with certain features.

Fraud is most common in the buying or selling of property, including real estate, Personal Property, and intangible property, such as stocks, bonds, and copyrights. State and federal statutes criminalize fraud, but not all cases rise to the level of criminality. Prosecutors have discretion in determining which cases to pursue. Victims may also seek redress in civil court.

Fraud must be proved by showing that the defendant's actions involved five separate elements: (1) a false statement of a material fact,(2) knowledge on the part of the defendant that the statement is untrue, (3) intent on the part of the defendant to deceive the alleged victim, (4) justifiable reliance by the alleged victim on the statement, and (5) injury to the alleged victim as a result. Fraud, Legal Dictionary, Retrieved November 14, 2015. http://legal-dictionary.thefreedictionary.com/fraud

# Securitization

## Securitization in General

### Definition

Securitization is the financial process of pooling receivables, such as residential mortgage loans, and using them as guarantee for the issuance of certificates which are sold to the investing public. The collections from the principal and interest on the loans are used to redeem the certificates and pay for their interest.

### Purpose

The purpose of securitization is to raise money in a relatively shorter period than it takes to collect on the loans. For example, while it may normally take 20 years to redeem 80% of the money being lent to various borrowers from their regular monthly amortizations, the same amount can be generated in as short as three to six months through securitization.

The new money raised from securitization is then used for new lending to other borrowers for the same type of loans and the new loans can also be pooled for yet another round of securitization.

The soar in demand for housing that started around the late 1990s resulted in the corresponding rise in the demand for funding on residential home mortgages. The purpose of securitization had to be achieved over and over again and the securitization process had to be repeated as many times – but with certain urgency. This required the establishment of channels through which loans can be quickly pooled unto a central operating unit, making them ready for securitization.

At first, the network in which these channels connected consisted of the central lender and its subsidiaries, affiliates, and correspondents. But soon small independent lenders joined in the fray. The reach of the central lenders have to be extended. This gave rise to warehouse lending.

Warehouse Lending

Warehouse lending is a short-term line of credit facility that is provided by a central lender to a small or remote lender in order to fund the closing of mortgages. The line is availed from the time the loan is granted by the small lender or purchased by it from another, and is paid off when the loan is sold by the small lender to the central lender. Warehouse lending made it possible for the central lender to accumulate loans faster than it could by lending those loans by itself.

## Parties

In the United States, the business entity which handles securitizations may be entitled to tax exemptions under the Internal Revenue Code if it qualifies as a Real Estate Investment Conduit (REMIC). A REMIC usually takes the form of a trust that was created by different entities. In most trusts these entities are affiliates of each other except for the trustees.

A typical securitization trust usually has the following parties:

- ❖ Originator – the party tasked with generating loans for the trust, either by lending the loans themselves or by acquiring them from other originators. A trust can have more than one originator.

- ❖ Seller and/or Sponsor – the party who pools the loans from the originators and sells them to the depositor. In some trusts the seller and the sponsor are the same entity, in others they are different, while in still others there is only a sponsor or a seller. When the sponsor is different from the seller, an originator is sometimes referred to as a seller. Still, in some trusts the functions of the seller are assumed by a party that is referred to as the responsible party or the company.

- ❖ Depositor – the party who sells the loans to the trustee. Some early trusts did not have sellers or sponsors. The depositor acquired the loans directly from the originating lenders or originators.

- ❖ Servicer or Master Servicer – the party who services the loans on behalf of the trust. A servicer could have been servicing the loans before they were securitized and

could have been the originator or seller or sponsor at the same time. Most trusts that have several servicers also have a master servicer.

- Trustee – the party who administers the trust for the benefit of its investors. Some trusts have only one trustee while others have and indenture trustee and an owner trustee. Still others that have a trustee also have another entity which acts as a co-trustee or a Delaware trustee.

- Custodian – the entity which, on behalf of the trustee, keeps possession of the assets and records of the trust. In some trusts the trustee or indenture trustee also acts as custodian.

## The Search for the Securitization Trust/Loan.

### Loan Granting

The subject loan was granted on June 26, 2017. The originating lender is LoanStar Home Loans, LLC DBA LoanStar Home Lending.

### Documentary Evidence

(*See also* The Chain of Title).

# The Chain of Title

## Chain of Title in General

Chain of title refers to the history of passing of title ownership to real property from the present owner back to the original owner. A record of title documents may be maintained by a registry office or civil law notary. Chains of title include notations of deeds, judgments of distribution from estates, certificates of death of a joint tenant, foreclosures, judgments of quiet title, and other recorded transfers of title to real property. Chain of Title Law and Legal Definition, Retrieved August 25, 2014, from http://definitions.uslegal.com/c/chain-of-title/

### Endorsement

Endorsement is the act of the owner or payee signing his/her name on the back of a check, bill of exchange or other negotiable instrument so as to make it payable to another or cashable by another person.

An endorsement in blank is also known as general endorsement. It specifies no particular endorsee and thereafter is payable to bearer and may be negotiated by delivery alone. An endorsement in blank is an unqualified endorsement, and thus the endorser thereof makes all warranties to all subsequent holders in due course specified in Section 3-417, Uniform Commercial Code. Endorsement, Law and Legal Definition, Retrieved & *abridged*, August 25, 2014, from http://definitions.uslegal.com/e/endorsement/

### Assignment

Assignment is the act of transferring an interest in property or right to another. Hill, G. and Hill, K. Assignment. Retrieved August 25, 2014, from http://dictionary.law.com/Default.aspx?selected=2451

An Assignment of Mortgage is therefore defined as a document that transfers the rights of the mortgagee in the Mortgage to another person.

In order to effectuate an assignment, the general rule is that the assignment must be in proper written format and recorded to provide notice of the assignment. Assignment of Deed of Trust or Mortgage, Retrieved August 25, 2014, from http://www.uslegalforms.com/assignments/assignment-of-mortgage.htm

## The Sequence of Transactions

The sequence of the required and the actual transactions pertaining to the subject loan and security instruments can be traced as follows:

| Seq. No. | Date | Promissory Note | Mortgage |
|---|---|---|---|
| 1 | June 26, 2017 | Loan Granting<br>Ivan Higgs, Borrowers<br>LoanStar Home Loans, LLC DBA LoanStar Home Lending, Originating Lender | Execution of Deed<br>Ivan Higgs, Grantors LoanStar Home Loans, LLC DBA LoanStar Home Lending, Originating Lender |

## The Sequence of Transactions, Explained

### 1. Loan Granting and Execution of Deed

The subject loan was granted on June 26, 2017. The parties in the promissory note are assumed to be Ivan Higgs, the borrowers and LoanStar Home Loans, LLC DBA LoanStar Home Lending, the originating lender.

The Mortgage was executed on the same date. The parties are Ivan Higgs, the grantors and LoanStar Home Loans, LLC DBA LoanStar Home Lending.

### Examiners' Comments

The burden of proof lies with LoanStar Home Loans, LLC DBA LoanStar Home Lending to show that it has in its actual physical possession both the unendorsed Fixed Rate Note and the Mortgage.

# Foreclosure

## Foreclosure, in General

Foreclosure is the procedure by which a party who has loaned money secured by a mortgage or deed of trust on real property (or has an unpaid judgment), forces the sale of the real property to recover the money due, unpaid interest, plus the costs of foreclosure, after the debtor fails to make payment. Foreclosure Law and Legal Definition, Retrieved August 25, 2014, from http://definitions.uslegal.com/f/foreclosure/

## Foreclosure Transactions

The chain of title is a possible fraudulent chain. Thus the note itself backing the debt, both could possibly be considered fraud. The debt itself being transferred could be fraudulently transferred.

This creates question as to the validity of the note, and could mean the note itself could be void. Thus any transfers of this debt(loan) to any financial instution is fraudulent, since the chain of ownership is not perfected. In the landmark case Glaski vs Bank of America, it was ruled in favour of the homeowner. It was ruled that the foreclosing entity must have both original note and deed of trust at the time of foreclosure.

Although the chain of tite/chain of ownerhip possibly not perfected. Which creates argument against anyone trying to foreclose.

- Original Note must be in possession of the foreclosing entity in order to foreclose, according to the case Glaski vs Bank of America
- On this property, it does not appear that the financial entities have poessession of the original note since an original copy has not yet been furnished. Thus they cannot foreclose. Nor do they have any right to the property, directly or indirectly.

Thus at this time, no financial entity or company can foreclose due to the original note argument.

# Affirmative Defenses

**Breach of Contract**

Definition: An accord and satisfaction is a legal contract whereby two parties agree to discharge a tort claim, contract, or other liability for an amount based on terms that differ from the original amount of the contract or claim.
Accord & satisfaction

**Accord & Satisfaction**

Requires a mortgage which is paid in full. Proof which is the assignment of mortgage. Once the mortgage is paid in full, the mortgage has to be transferred back into the original owners name free and clear.

Technically speaking according to this provision, the mortgage loan/lien has been paid in full.

When a mortgage is sold to another company, the mortgage lien has been technically satisfied. The originating lender must put the property title back into the homeowners name.

Provision 23 in the mortgage contract document states the following

The highlighted wording here is "Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument."
The "payment of all sums" was received when the loan was sold according to the assignment filed below on the property with MERS involved.

This this loan was "sold". Paid in full. Thus this loan has been satisfied in full.

An accord and satisfaction has occurred on this mortgage loan with the assignment on record using the actual documents themselves are proof.

Thus this loan should be adjusted from the property, or proper negotiations must be given to redo the terms, balance of this loan.

- The loan should be placed back into the homeowners name and the lender should back away of any baseless claims they are making for enforcement of this loan. Since it has been paid off technically.
- Lender must release this security instrument using the verbiage of the lenders own contract on the mortgage loan contract
- Any foreclosure proceedings against the property in question are completely fraudulent and must be halted and voided immediately.

CASE

**Weiss v Phillips 2017 NY Slip Op 08209 - November 21, 2017**

**Summary**

**Facts**: In this case before the New York Appellate Division (First Department), defendant Edward Phillips purchased two distressed properties, one of which he transferred to a relative. The two agreed the relative would obtain a mortgage on the property, which Phillips would pay, and would transfer the property back to Phillips at a later date. Four years later, Phillips's attorney sent a paralegal to obtain the relative's signature on a blank deed in order to transfer the property back to Phillips. Instead, the paralegal inserted his mother's name as the grantee on the deed, and the mother later deeded the property to herself and the paralegal. On or about that same date, plaintiff Peter Weiss lent $500,000 to the paralegal and his mother in exchange for a note and mortgage on the property. At this point, the loan obtained by Phillips's relative remained unpaid, with about $450,000 due. When Phillips learned about the fraudulent transactions, he filed a lawsuit, which was settled when the paralegal and his mother agreed to transfer title on the property back to Phillips.

After settling the lawsuit, Phillips learned that the loan with Weiss was in default and that Weiss intended to foreclose on the property. Phillips thus executed a Consolidated Extension Mortgage Agreement Note (CEMA) with Weiss through which Phillips acknowledged the validity of Weiss's loan and mortgage on the property and agreed to waive all defenses and counterclaims in exchange for a one-year extension of the loan. After the year passed, Weiss commenced this action and filed a motion for summary judgment seeking to foreclose. The trial court granted Weiss's motion over Phillips's objections, including that the mortgage was unenforceable because it was based on a void deed.

**Holding**: On appeal, the New York Appellate Division (First Department) affirmed the trial court's decision in an opinion authored by Justice Renwick. Among other things, the court held that the deed here was the result of a fraudulent inducement and not a forgery, which made it only voidable rather than void. Further, contrary to Phillips's arguments, the court held that Weiss was a bona fide encumbrancer due to the CEMA's provision that Phillips acknowledged and ratified Weiss's rights under the loan documents and waived any claims or defenses regarding the same. Additionally, the court rejected Phillips's claim that the CEMA was unconscionable and that he did not understand its terms. Phillips executed it with the advice of counsel, in part because of counsel's advice that Weiss might have an equitable subrogation claim because purportedly $450,000 of the $500,000 in loan proceeds from his loan were used to discharge Phillips's relative's mortgage on the property. The court further found that this was not a typical foreclosure mandating the production of the promissory note tied to the mortgage before the foreclosure could proceed. This was so because Phillips acknowledged Weiss's right to foreclose in the CEMA and there was no question that Weiss was the holder of the note and mortgage as evidenced by the CEMA and the parties' deposition testimony. As such, the court held that summary judgment was appropriate.

Justice Gesmer authored a lengthy concurrence in part and dissent in part. The focus on the dissent was the argument that UCC 3-804 required Weiss to produce the original Note to foreclose or explain how it was lost or destroyed. The dissent also found that the CEMA was ambiguous on whether Phillips was assuming responsibility to pay the mortgage and questioned whether Weiss was a bona fide encumbrancer as he did no investigation into the fraudsters' creditworthiness or the bona fides of the property.

**Relevance to the title industry**: This decision is a reminder of the importance of having a party acknowledge the validity of title or a lien in documents resolving title disputes whether those documents take the form of a settlement agreement, a modification or an extension of a mortgage. Weiss unknowingly made a $500,000 loan secured by a mortgage on a property that the borrowers obtained via fraud. Through the CEMA, however, Weiss ensured that the mortgage was enforceable against the property by his having the property's "true" owner be a party to the CEMA and acknowledge the mortgage lien. Additionally, the decision reemphasizes the importance of the doctrine of equitable subrogation to lenders or title insurance companies which, according to Phillips's attorney, was part of the reason Phillips agreed to execute the CEMA and ratify the mortgage.

https://law.justia.com/cases/new-york/appellate-division-first-department/2017/810090-10-3935.html

1. **FRAUD CASES**

**US Bank N.A. v Nelson - January 24, 2019**

**Summary**

The question in this case is whether a foreclosure defendant preserves the defense of lack of standing if the answer denies the plaintiff's allegation of standing but does not separately plead lack of standing as an affirmative defense.

The facts are straightforward. Defendants defaulted on a loan secured by a mortgage, and US Bank commenced this action to foreclose on the loan. The complaint alleged that US Bank was "the owner and holder" of the mortgage being foreclosed. Defendants' answers denied information sufficient to confirm the truth of that allegation, but did not separately allege that plaintiff lacked standing to commence the action. Supreme Court granted US Bank's motion for a judgment of foreclosure and denied defendants' motion to dismiss for, among other reasons, lack of standing.

A divided panel of the Second Department affirmed. The majority noted that, as a general matter, a defendant is not required to affirmatively plead in its answer that the plaintiff failed to allege some essential element of a claim; it is enough to simply deny the plaintiff's allegations. But a defendant is required to affirmatively plead any matter that is not the plaintiff's burden to prove as part of the claim. And standing is not an essential element of a foreclosure claim; the issue arises only if defendant raises it. So, the majority held, a defendant could forfeit the defense of lack of standing by failing to affirmatively plead it in the answer or raise the defense in a pre-answer motion to dismiss. And while the majority stressed that no "magic words" or "ritualistic formulation" was required, a "mere denial of factual allegations will not suffice."

A single judge dissented. The dissenter concluded that a denial of the plaintiff's factual allegations of standing would put a plaintiff on notice that standing would be in issue. And given the notice function of pleading, such a denial should be sufficient to plead the defense of lack of standing, regardless whether it is expressly labeled a "defense" or an "affirmative defense."

**U.S. BANK NATIONAL ASSOCIATION v. SILVANA SOTILLO - June 5, 2017**

xxxxx.................. "We review a grant of a motion to dismiss a complaint for failure to state a cause of action de novo, applying the same standard under Rule 4:6-2(e) that governed the motion court." Wreden v. Township of Lafayette, 436 N.J. Super. 117, 124 (App. Div. 2014). Thus, we are "limited to examining the legal sufficiency of the facts alleged on the face of the complaint." Nostrame v. Santiago, 213 N.J. 109, 127 (2013) (quoting Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)). We are required to "'search[] the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary.' .........................xxxxxxxxxxxxxx

xxxxx.................... that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgement or order as a matter of law." R. 4:46-2(c). The court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995). .................xxxxxxxxxxxxxxx

We have held "an assignee of a [contract] can be held liable under the CFA, for its own unconscionable commercial activities in the subsequent performance of the assigned contract." Jefferson Loan Co., Inc. v. Session, 397 N.J. Super. 520, 533 (App. Div. 2008). We made clear "[o]ur holding is limited to an

assignee's own unconscionable commercial practices . . . , not an assignee's derivative liability for the actions of the assignor of the [contract]." Id. at 538.4

Xxxxx.............. . a transfer of the negotiable instrument to a holder in due course to whom the mortgage is also assigned will enable the assignee to enforce the mortgage (as well as the negotiable instrument) according to its terms, free and clear of any personal defenses the mortgagor may have against the assignor. This results from the view that the mortgage is mere "incident" or "accessory" to the debt and when the debt is embodied in a negotiable instrument the quality of negotiability is necessarily imparted to the accompanying mortgage.

N.J.S.A. 12A:3-305(a) in turn provides such an obligor may assert real defenses, namely

(1) a defense of the obligor based on infancy of the obligor to the extent it is a defense to a simple contract, duress, lack of legal capacity, or illegality of the transaction which, under other law, nullifies the obligation of the obligor, fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms, or discharge of the obligor in insolvency proceedings[,]

(2) a defense of the obligor stated in another section of this chapter or a defense of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract; [or]

(3) a claim in recoupment of the obligor against the original payee of the instrument if the claim arose from the transaction that gave rise to the instrument[.]

## 2. VIOLATIONS OF TILA

**JERRY HOANG VS BANK OF AMERICA -** December 6, 2018

**SUMMARY**

**Truth in Lending Act**
The panel reversed the district court's dismissal of an action brought by a borrower against Bank of America, N.A., alleging claims under the Truth in Lending Act ("TILA") after the bank declared the borrower in default on a loan and initiated non-judicial foreclosure proceedings.
If a creditor fails to make required disclosures under

TILA, borrowers are allowed three years from the loan's consummation date to rescind certain loans. 15 U.S.C. § 1635(f). The borrower sent the bank notice of intent to rescind the loan within three years of the consummation date. The panel held that under *Jesinoski v. Countrywide Home Loans*, 135 S. Ct. 790, 792 (2015), borrowers may affect rescission of such a loan simply by notifying the creditor of their intent to rescind within the three-year period from the loan's consummation date. The panel further held that because TILA did not include a statute of limitations outlining when an action to enforce such a rescission must be brought, courts must borrow the most analogous state law statute of limitations and apply that limitation period to TILA rescission enforcement claims. The panel held that in Washington, the state's six-year contract statute of limitations was the most analogous statute. The panel rejected the district court's application of TILA's one-year statute of limitations for legal damages claims. The panel also rejected

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

HOANG V. BANK OF AMERICA 3

the bank's argument that Washington's two-year catch-all statute of limitations should apply. Because the borrower brought this action within six years, the district court erred in dismissing the TILA claim as time barred.

The panel held that the district court improperly denied the borrower leave to amend the complaint. The district court made its determination based on its determination that amendment would be futile because the claims were timebarred. The panel held that because the borrower's TILA rescission enforcement claim was not time-barred, an amendment by the borrower would not be futile.

**OPINION**

N.R. SMITH, Circuit Judge:

If a creditor fails to make required disclosures under the Truth in Lending Act (TILA), borrowers are allowed three years from the loan's consummation date to rescind certain loans.**1** 15 U.S.C. § 1635(f). Borrowers may effect that rescission simply by notifying the creditor of their intent to rescind within the three-year period. *Jesinoski v. Countrywide Home Loans*, 135 S. Ct. 790, 792 (2015). TILA does not include a statute of limitations outlining when an action to enforce such a rescission must be brought. Without a statute of limitations in TILA, courts must first borrow the most analogous state law statute of limitations and apply that limitation period to TILA rescission enforcement claims. *Cty. of Oneida v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 240 (1985). In Washington, the state's six-year contract

statute of limitations is the most analogous statute. We have jurisdiction under 28 U.S.C. § 1291, and we reverse and remand for further proceedings.

## 3. LACK OF JURISDICTION

**U.S. BANK NATIONAL ASSOCIATION v. MERVIN HODGE – October 18, 2018**

"Service by mail is not effective . . . unless plaintiff first made 'a reasonable and good faith attempt' to serve defendant personally." City of Passaic v. Shennett, 390 N.J. Super 475, 483 (App. Div. 2007) 3(a)). "A party's good faith effort to personally serve a defendant must be 'described with specificity in the proof of service.'" Ibid. (quoting R. 4:4-3).

The Chapter 7 discharge of debt did not impact plaintiff's mortgage lien. The Order of Discharge specifically notes "a creditor may have the right to enforce a valid lien, such as a mortgage or security interest, against the debtor's property after the bankruptcy, if that lien was not avoided or eliminated in the bankruptcy case."

**SHAROVA V WELLS FARGO BANK, N.A. - January 3, 2019**

xxx........"with respect to an action pursuant to RPAPL 1501(4), a person having an estate or an interest in real property subject to a mortgage can seek to cancel and discharge that encumbrance where the period allowed by the applicable statute of limitations for the commencement of an action to foreclose the mortgage has expired, provided that the mortgagee or its successor was not in possession of the subject real property at the time the action to cancel and discharge the mortgage was commenced ........xxxxxxxxxxxx

**King v. Wells Fargo Bank, N.A.**

**xxx..............** entire controversy doctrine, codified in Rule 4:30A of the New Jersey Court Rules, "embodies the principle that the adjudication of a legal controversy should occur in one litigation in only one court.". The doctrine requires litigants to assert all affirmative claims relating to the controversy between them in one action, and to join all parties with a material interest in the controversy, or be forever barred from bringing a subsequent action involving the same underlying facts. ........xxxxx...... . In other words, any claim challenging the foreclosure-plaintiff's "right to foreclose" is "germane" to a foreclosure action and must be raised there.

Arguments against Foreclosure

Considering all of the fraud involved with securitization & mortgages, these important points/consideration must be considered.

- Original Note has been lost or destroyed
- Note and Deed of Trust have been separated
- Possible MERS fraud involved with this loan
- The right party to foreclosure must have original note, as well as deed of trust to foreclosure, in this case no one entity does. Thus foreclosing on this property is completely fraudulent.

According to the landmark case, Glaski Vs. Bank of America. The case was determined that in order for a company/financial entity to foreclose on a property, the company/financial entity must have both the mortgage note and the deed of trust together at the time of foreclosure. On this specific loan this is not the case, and the foreclosing entity does not have both the original mortgage note, nor the deed of trust. Hence the conclusion is that they cannot foreclose.

**Law Analysis/Citation**

The trial court has confirmed it. Now the appellee's brief confirms it. There is no legal precedent for this case to be on the Judicial Branch website. None has been cited, appellant has found no such precedent in Connecticut or for that matter in the United States. And this Court agrees…15 months ago. JP Morgan Chase Bank, N.A. vs. Virgulak, 192 Conn.App. 688 (2019). And if appellant is mistaken, he is in great company, because neither the trial court nor the plaintiff, nor the Appellate Court has been able to cite a case --- a holding. This Court agrees with appellant and with a holding:

The plaintiff has cited no authority, and we have found none, that stands for the proposition that…a court can foreclose a mortgage that purports to secure a nonexistent debt. Id., supra at 705.

Case Citation

JP Morgan Chase Bank vs Dirgulak. Case Citation: 218A.3d

**Chain of Title:**

The chain of title is a possible fraudulent chain. Thus the note itself backing the debt, both could be considered fraud. The debt itself being transferred could be fraudulently transferred.

This creates question as to the validity of the note, and could mean the note itself could be void. Thus any transfers of this debt(loan) to any financial instution is fraudulent, since the chain of ownership is not perfected. In the landmark case Glaski vs Bank of America, it was ruled in favour of the homeowner. It was ruled that the foreclosing entity must have both original note and deed of trust at the time of foreclosure.

Although the chain of tite/chain of ownerhip is possibly not perfected. Which creates argument against anyone trying to foreclose.

- Original Note must be in possession of the foreclosing entity in order to foreclose, according to the case Glaski vs Bank of America
- On this property, it does not appear that the financial entities have possession of the original note, thus they cannot foreclose. Nor do they have any right to the property, directly or indirectly.
- Thus at this time, no financial entity or company can foreclose due to the original note argument.

**MERS & The Debt**

MERS does record the assignment in the actual real property records system. The actual note itself, is the creation of the legal obligation to have the loan/note repaid for the debt. Thus the note is the actual legal document which backs the debt. The debt itself has not been transferred or negotiated by MERS

- MERS does record the assignment in the actual real property records system. The actual note itself, is the creation of the legal obligation to have the loan/note repaid for the debt. Thus the note is the actual legal document which backs the debt. The debt itself has not been transferred or negotiated by MERS

- MERS is not legally entitled to receive monthly payments from the borrower. MERS cannot legally be entitled to benefit from a foreclosure in any sale of the home in a foreclosure sale.

- MERS does not own the mortgage note, thus it cannot attempt to foreclose.

- MERS cannot have any legal claim or interest in the loan interest, the debt, security instrument which MERS serves as a nominee.

- Regarding MERS policy and legalities, only a MERS member can transfer to another MERS member. A non MERS member cannot conduct transfers for a MERS member and vice versa.

**Note: MERS section included here to give a background information to mers as it relates to "other" mortgages which mers has been involved in.**

The chain of title is a possible fraudulent chain. Thus the note itself backing the debt, both could possibly be considered fraud. The debt itself being transferred could be fraudulently transferred.

This creates question as to the validity of the note, and could mean the note itself could be void. Thus any transfers of this debt(loan) to any financial instution is fraudulent, since the chain of ownership is not perfected. In the landmark case Glaski vs Bank of America, it was ruled in favour of the homeowner. It was ruled that the foreclosing entity must have both original note and deed of trust at the time of foreclosure.

Although the chain of tite/chain of ownership possibly not perfected. Which creates argument against anyone trying to foreclose.

- Original Note must be in possession of the foreclosing entity in order to foreclose, according to the case Glaski vs Bank of America

- On this property, it does not appear that the financial entities have poessession of the original note since an original copy has not yet been furnished. Thus they cannot foreclose. Nor do they have any right to the property, directly or indirectly.
- Thus at this time, no financial entity or company can foreclose due to the original note argument.

**CASES**

**CAPITAL ONE, N.A v. LAURENCE FRANKLIN -** November 4, 2019

**Summary:**

**If Held Separately, Note and Mortgage Assignment Both Needed to Foreclose, Court Says**

**A New Jersey appeals court has held in a published ruling that a party seeking to foreclose on a mortgage must have both the promissory note and a valid assignment of mortgage.**

A New Jersey appeals court has held in a published ruling that a party seeking to foreclose on a mortgage must have both the promissory note and a valid assignment of mortgage. But in a case where Capital One Bank brought a foreclosure action on a property when it possessed the mortgage but not the note, the appeals court said irregularities did not warrant reversal. James Peck IV appealed the Aug. 26, 2016, judgment of foreclosure by Capital One, which was the loan servicer for Freddie Mac. Peck, an attorney who litigated the case pro se, maintained that only Freddie Mac had standing to foreclose. Peck represented himself until his death in July 2016, when counsel was retained. According to the Appellate Division's opinion Monday, Peck took out a $258,750 mortgage with Chevy Chase Bank in March 2005, and a few months later the bank sold the note to Freddie Mac but retained the mortgage. In 2009, Chevy Chase merged with Capital One, and in 2010 Peck defaulted on the mortgage. A first attempt by Capital One to foreclose on Peck's property was dismissed without prejudice in June 2012 because the bank failed to comply with a court-ordered deposition of an employee who could shed light on possible mortgage irregularities, the court said. In those proceedings, Capital One brought the original note to court, but it was returned to Freddie Mac later that year. In February 2013, Capital One started the present foreclosure proceedings. Peck contested the action, but a judge dismissed his answer and referred the case to the Office of Foreclosure for entry of final judgment as uncontested. Peck's motion for reconsideration was denied in May 2016, and his motion for summary judgment—which he apparently filed shortly before his death—was denied in November 2016, according to the Appellate Division. On appeal before Judges Jose Fuentes, Ellen Koblitz and Thomas Manahan, Peck's estate, represented by Nicholas Stratton of Stratton Stepp in

Glen Rock, asserted that Freddie Mac, as owner of the loan, is "the only entity with the right to enforce the mortgage." The Appellate Division panel said that, when the note is separated from the mortgage, "the plaintiff in a foreclosure action must demonstrate both possession of the note and a valid mortgage assignment prior to filing the complaint." Such a policy precludes "the possibility of one entity foreclosing on the home while the other enforces the note," Koblitz said, writing for the panel. Peck's estate conceded that Freddie Mac, as owner of the note, had the right to foreclose on the home. The estate argued, however, that the mortgage was not legally retained by Chevy Chase Bank, but followed the note by force of law. "We reject that analysis. The issue is whether Capital One, both the successor owner and assignee of the mortgage, and the loan servicer, had the right to foreclose," Koblitz wrote. She cited a 2013 Freddie Mac internal bulletin, which said, "Foreclosures must normally be processed or litigated in the [s]ervicer's name." Since the defendant was provided more than sufficient notice that Capital One was the servicer for Freddie Mac, and since Freddie Mac publicly declared its policy to foreclose through its servicers, and since Capital One did possess the note at an earlier foreclosure proceeding as well as an assignment, the court said the irregularities were not sufficient to reverse the foreclosure judgment. "We do not intend by this decision to approve the way this foreclosure was prosecuted. The note should have been in Capital One's possession at the time it filed this foreclosure complaint," Koblitz wrote for the court. Stratton said he was considering an appeal to the Supreme Court. Calling the ruling "frustrating," "hard to square with other cases" and "super confusing," he said the ruling holds that, "by operation of law, the mortgage does not follow the note. Previously, if you own the note, the mortgage follows the note." Stratton, who represents homeowners in foreclosure cases, expressed concern about the precedential nature of the ruling. "It's a published case—you're going to see this case pop up in foreclosure matters," he said. "I'm not sure anyone knows how this is going to play out." The lawyer for Capital One, Danielle Weslock of McCarter & English in Newark, did not return a call about the case.

**Investors Bank, Plaintiff-Respondent, v. Javier Torres, Defendant-Appellant, and Mrs. Javier Torres, his wife, and Dora M. Dillman, Defendants. - 07-01-2020**

**xxx...** the courts ensure that the defendant will be adequately protected against a claim to the instrument by a holder that may appear at some later time. ......xxx

xxxxx..... N.J.S.A. 12A:3-309 plainly bars a party that possessed a lost promissory note before it was lost from transferring its interests under that note after the loss. ...........xxxx

a. A person not in possession of an instrument is entitled to enforce the instrument if the person was in possession of the instrument and entitled to enforce it when loss of possession occurred, the loss of possession was not the result of a transfer by the person or a lawful seizure, and the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.

**Kolbasyuk v. Capital Management Services, LP, No. 18-1260 (2d Cir. 2019) - March12,2019**

**SUMMARY**

A debt collection letter that informs the consumer of the total, present quantity of his or her debt satisfies 15 U.S.C. 1692g notwithstanding its failure to inform the consumer of the debt's constituent components or the precise rates by which it might later increase. Such a letter does not violate section 1692e for failure to inform the consumer that his or her balance might increase due to interest or fees when the letter contains the "safe harbor" language previously ratified in Avila v. Riexinger & Associates, LLC, 817 F.3d 72 (2d Cir. 2016).

In this case, after plaintiff received a debt collection letter from CMS, he filed suit against the company under the Fair Debt Collection Practices Act. The Second Circuit affirmed the district court's dismissal of plaintiff's claims, holding that CMS's letter complied with sections 1692g and 1692e.

## Debt Validity Argument + Additional Arguments

Debt Collection Validity

- If a debt cannot be validated, there can be no collection of it. This is established by 15 USC 1692g(b).
- Disputed Debts a debt collector must cease collection of the debt until it is validated.

18 U.S. Code § 241 - Conspiracy against rights

### Additional Argument:

"Where there are no depositions, admissions, or affidavits the court has no facts to rely on for a summary determination."

Trinsey v. Pagliaro, D.C. Pa. 1964, 229 F. Supp. 647.

The National Bank Act of 1864, Section 28, "Such associations shall not purchase or hold real estate in any other case or for any other purpose than as specified in this section. Nor shall it hold possession of any real estate under mortgage, or hold the title and possession of any real estate purchased to secure any debts due to it for a longer period than five years."

**Law Analysis/Citation:**
The trial court has confirmed it. Now the appellee's brief confirms it. There is no legal precedent for this case to be on the Judicial Branch website. None has been cited, appellant has found no such precedent in Connecticut or for that matter in the United States. And this Court agrees…15 months ago. JP Morgan Chase Bank, N.A. vs. Virgulak, 192 Conn.App. 688 (2019). And if appellant is mistaken, he is in great company, because neither the trial court nor the plaintiff, nor the Appellate Court has been able to cite a case --- a holding.
This Court agrees with appellant and with a holding:
The plaintiff has cited no authority, and we have found none, that stands for the proposition that…a court can foreclose a mortgage that purports to secure a nonexistent debt. Id., supra at 705.
Case Citation
JP Morgan Chase Bank vs Dirgulak. Case Citation: 218A.3d

CASE
Boucher v. Fin. Sys. of Green Bay, 880 F.3d 362

In Boucher v. Fin. Sys. of Green Bay, a debt collector sent a Wisconsin borrower a notice that closely tracked safe harbor language that 7th Circuit had previously ruled to comply with the FDCPA—except for one thing. The debt collector's notice indicated that the Wisconsin borrower may be liable for "late charges and other charges." The borrower sued the debt collector under the FDCPA asserting that the "late charges and other charges" language in the notice violated the statute. The debt collector countered that its notice tracked the safer harbor language and the notice could not violate the FDCPA as a matter of law.

Basing its decision in part on Wisconsin law, the 7th Circuit found the debt collector's notice was misleading to an unsophisticated consumer particularly given that Wisconsin law does not allow a debt collector to recover late charges and other charges. Accordingly, the 7th Circuit agreed with the borrower that the notice was confusing to the unsophisticated consumer.

In addition to limiting the value of "safe harbor" language, the 7th Circuit cautioned lower courts against dismissing FDCPA claims based upon deceptive notices. That is because the 7th Circuit suggests that "district court judges are not good proxies for the 'unsophisticated consumer' whose interest the [FDCPA] protects."

https://caselaw.findlaw.com/us-7th-circuit/1886136.html

Saccameno v. U.S. Bank National

Around 2009, Saccameno defaulted on her mortgage. U.S. Bank began foreclosure proceedings. She began a Chapter 13 bankruptcy plan under which she was to cure her default over 42 months while maintaining her monthly mortgage payments, 11 U.S.C. 1322(b)(5). In 2011, Ocwen acquired her previous servicer. Ocwen, inexplicably, informed her that she owed $16,000 immediately. Saccameno continued making payments based on her plan. Her statements continued to fluctuate. In 2013, the bankruptcy court issued a notice that Saccameno had completed her payments. Ocwen never responded; the court entered a discharge order. Within days an Ocwen employee mistakenly treated the discharge as a dismissal and reactivated the foreclosure. For about twp years, Saccameno and her attorney faxed her documents many times and spoke to many Ocwen employees. The foreclosure protocol remained open. Ocewen eventually began rejecting her payments. Saccameno sued, citing breach of contract; the Fair Debt Collection Practices Act; the Real Estate Settlement Procedures Act; and the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFDBPA), citing consent decrees that Ocwen previously had entered with regulatory bodies, concerning inadequate recordkeeping, misapplication of payments, and

poor customer service. The jury awarded $500,000 for the breach of contract, FDCPA, and RESPA claims, plus, under ICFDBPA, $12,000 in economic, $70,000 in non-economic, and $3,000,000 in punitive damages. The Seventh Circuit remanded. While the jury was within its rights to punish Ocwen, the amount of the award is excessive.

https://law.justia.com/cases/federal/appellate-courts/ca7/19-1569/19-1569-2019-11-27.html

***1: McCollough*, *supra*, 637 F.3d 939,** which held that a debt collector had violated the FDCPA by serving "requests for admission" upon a pro se defendant that: (1) "asked the [debtor] to admit facts that [the debt collector knew] were not true"; and (2) did not include an explanation that, under Montana law , the requests would be deemed admitted if not responded to within 30 days. The Ninth Circuit concluded that "the service of requests for admission containing false information upon a pro se defendant without an explanation that the requests would be deemed admitted after thirty days constitutes 'unfair or unconscionable' or 'false, deceptive, or misleading' means to collect a debt." (*Id*. at p. 952.) In reaching its holding, the court rejected the debt collector's assertion that improper discovery techniques should be remedied through "[state] court rules for civil procedure" rather than through "liability under the FDCPA." (*Id*. at p. 951.) The court explained that Congress had "enacted the FDCPA expressly because prior laws for redressing 'abusive, deceptive, and unfair debt collection practices' were 'inadequate to protect consumers.' [Citation.] The statute preempts state laws 'to the extent that those laws are inconsistent with any provision of [the FDCPA].' [Citation.]" (*Ibid*.)

To demonstrate a violation of the FDCPA, the moving party must show (among other things) that: (1) the defendant is a "debt collector" within the meaning of the statute; and (2) the defendant committed some act or omission in violation of the FDCPA. (See *Robinson v. Managed Accounts Receivables Corp*. (C.D. Cal. 2009) 654 F.Supp.2d 1051, 1057.) *Bretches v. OneWest Bank*, B257013, at *13-14 (Cal. Ct. App. Sep. 14, 2015)

15 U.S. Code § 1692g - Validation of debts

U.S. Code

prev | next

(a) Notice of debt; contentsWithin five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing—

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;
(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and
(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.
(b) Disputed debts

If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector. Collection activities and communications that do not otherwise violate this subchapter may continue during the 30-day period referred to in subsection (a) unless the consumer has notified the debt collector in writing that the debt, or any portion of the debt, is disputed or that the consumer requests the name and address of the original creditor. Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor.
(c) Admission of liability

The failure of a consumer to dispute the validity of a debt under this section may not be construed by any court as an admission of liability by the consumer.
(d) Legal pleadings

A communication in the form of a formal pleading in a civil action shall not be treated as an initial communication for purposes of subsection (a).
(e) Notice provisions

The sending or delivery of any form or notice which does not relate to the collection of a debt and is expressly required by title 26, title V of Gramm-Leach-Bliley Act [15 U.S.C. 6801 et seq.], or any provision of Federal or State law relating to notice of data security breach or privacy, or any regulation prescribed under any such provision of law, shall not be treated as an initial communication in connection with debt collection for purposes of this section.

(Pub. L. 90–321, title VIII, § 809, as added Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 879; amended Pub. L. 109–351, title VIII, § 802, Oct. 13, 2006, 120 Stat. 2006.)

# Fair debt collections act usc 1692

## § 805. Communication in connection with debt collection

**(a) Communication with the consumer generally**
Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with the collection of any debt --
(1) at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer. In the absence of knowledge of circumstances to the contrary, a debt collector shall assume that the convenient time for communicating with a consumer is after 8 o'clock antemeridian and before 9 o'clock postmeridian, local time at the consumer's location;
(2) if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer; or
(3) at the consumer's place of employment if the debt collector knows or has reason to know that the consumer's employer prohibits the consumer from receiving such communication.
**(b) Communication with third parties**
Except as provided in section 1692b of this title, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.
**(c) Ceasing communication**
If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt, except --
(1) to advise the consumer that the debt collector's further efforts are being terminated;
(2) to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or
(3) where applicable, to notify the consumer that the debt collector or creditor intends to invoke a specified remedy.
If such notice from the consumer is made by mail, notification shall be complete upon receipt.
**(d) "Consumer" defined**
For the purpose of this section, the term "consumer" includes the consumer's spouse, parent (if the consumer is a minor), guardian, executor, or administrator. 15 USC 1692d

## § 807. False or misleading representations

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
(1) The false representation or implication that the debt collector is vouched for, bonded by, or affiliated with the United States or any State, including the use of any badge, uniform, or facsimile thereof.
(2) The false representation of --

(A) the character, amount, or legal status of any debt; or
(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
(3) The false representation or implication that any individual is an attorney or that any communication is from an attorney.
(4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action.
(5) The threat to take any action that cannot legally be taken or that is not intended to be taken.
(6) The false representation or implication that a sale, referral, or other transfer of any interest in a debt shall cause the consumer to --
(A) lose any claim or defense to payment of the debt; or
(B) become subject to any practice prohibited by this subchapter.
(7) The false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer.
(8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.
(9) The use or distribution of any written communication which simulates or is falsely represented to be a document authorized, issued, or approved by any court, official, or agency of the United States or any State, or which creates a false impression as to its source, authorization, or approval.
(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.
(11) The failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, except that this paragraph shall not apply to a formal pleading made in connection with a legal action.
(12) The false representation or implication that accounts have been turned over to innocent purchasers for value.
(13) The false representation or implication that documents are legal process.
(14) The use of any business, company, or organization name other than the true name of the debt collector's business, company, or organization.
(15) The false representation or implication that documents are not legal process forms or do not require action by the consumer.
(16) The false representation or implication that a debt collector operates or is employed by a consumer reporting agency as defined by section 1681a(f) of this title.
15 USC 1692f

## § 809. Validation of debts

**(a) Notice of debt; contents**
Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing --
(1) the amount of the debt;
(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;
(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and
(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.
**(b) Disputed debts**
If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) of this section that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector. Collection activities and communications that do not otherwise violate this subchapter may continue during the 30-day period referred to in subsection (a) unless the consumer has notified the debt collector in writing that the debt, or any portion of the debt, is disputed or that the consumer requests the name and address of the original creditor. Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor.
**(c) Admission of liability**
The failure of a consumer to dispute the validity of a debt under this section may not be construed by any court as an admission of liability by the consumer.
**(d) Legal pleadings**
A communication in the form of a formal pleading in a civil action shall not be treated as an initial communication for purposes of subsection (a).

**(e) Notice provisions**
The sending or delivery of any form or notice which does not relate to the collection of a debt and is expressly required by title 26, title V of Gramm-Leach-Bliley Act [15 U.S.C. 6801 et seq.], or any provision of Federal or State law relating to notice of data security breach or privacy, or any regulation prescribed under any such provision of law, shall not be treated as an initial communication in connection with debt collection for purposes of this section.
15 USC 1692h
Source: https://www.ftc.gov/legal-library/browse/rules/fair-debt-collection-practices-act-text

# Right of Rescission Laws & Case Laws

## Mortgage Rescission

## Right of Rescission /Right to Cancel Mortgage Argument

**The notice of right to cancel disclosure was not provided to this client/homeowner. Thus the recent supreme court ruling on this sensitive matter gives the client/homeowner grounds to ask for cancellation of the mortgage/loan. It would be wise for the foreclosing bank or lender the client/homeowner is interacting with to give the client/homeowner favorable terms or to negotiated with the client/homeowner in order to avoid the legal proceedings that might follow considering the severity of these violations by the bank/lender/foreclosing entity.**

*Notice Of Right To Cancel TILA (Truth In Lending Act, 15 USC Section 1601 et seq; 12 CFR Part 266)* allows three (3) days to review Disclosure Documents. The referenced "Three Day Right To Cancel" must have a trigger to begin. That trigger is, when the Lender has provided the Borrower with ALL of the required Disclosures under *TILA*, and that the same are true, complete, accurate, and timely provided.
Being as the entire loan/mortgage process and Mortgage Note referenced herein and throughout, was obtained by wrongful acts of fraud, fraudulent inducement, concealment and fraudulent misrepresentation, the Borrower has other recourse, right, and cause of action under numerous State and Federal statutes.

Pursuant to the United State Supreme Court's decision in Jesinoski v. Countrywide Home Loans, Inc. (2015), 135 S.Ct. 790, TILA gives me, as a borrower, the right to rescind the subject loan until midnight of the third business day following the consummation of the transaction or the delivery of the disclosures required under TILA. I am hereby notifying you, as the creditor, of my intention to do so as you and/or your predecessors have failed to satisfy the TILA disclosure requirements, including but not limited to delivery of a written document to me explaining my rights at the time of the transaction.
To this date, Lender has never provided Borrower with true, complete, accurate or timely documents as required. ONLY AFTER such provision has been complied with can the "3 DAY RIGHT TO CANCEL" period begin. If the required full Disclosures have not been provided, then the period in which to CANCEL is extended for up to three (3) years, or until Lender moves to foreclose. The records thus far evidence that Borrower has requested to cancel within the three (3) year stipulated time period, while still waiting to receive all truth-in-lending disclosures as required by Federal Law, the same of which has never been received.

A close perusal, and audit of Borrower's note/loan documents have revealed certain Disclosure Violations, and that the Borrower has the remedial right and remedy pursuant to *UCC 1-201 (32) (34)*, inter alia, to invoke their Right Of Rescission (ROR), as further evidenced by the original NOTICE OF RIGHT TO CANCEL. This letter shall constitute NOTICE to all Lender(s), Successor(s), and Beneficiaries assigned, and/or appointed.

After sufficient NOTICE has been given to Lender, the Lender is required by Federal Law to CANCEL any lien(s), and to CANCEL any security interest on the Borrower's property within twenty (20) days. The Lender must also return any money, interest, fee, and/or property to the Borrower, as well as any money/funds given to any person or fiction in law/entity in connection with said transaction.

In accordance with both State and Federal law or until Lender complies, Borrower may retain the proceeds of the transaction. If it should be “impractical”, or “Unfair” for the Borrower to return the property when gross discrepancies, fraud, or other wrongful acts are discovered, then he/she/they may offer its “Reasonable Value”.

In the event that the Lender should fail, or refuse to return the Borrower’s money offer within twenty (20) days, the Borrower may then regain/acquire all rights to clear title and reconveyance under ***Federal law***, ***State Statutes***, ***Uniform Commercial Code***, and provisions of *TILA*, with the same being supported by the evidence of both public and bank records, and further as attached hereto.

Additionally, Borrower has the right to offer Lender a Reasonable Value. However, the penalties a bank can face for violations of *TILA*, and other State and Federal law can be as much as triple the damages, i.e., triple the amount of the interest the bank stood to fraudulently make off the mortgage/loan transaction. Therefore, the Borrower(s) hereby in good faith makes the following offer: Borrower will forgive bank/trust any liability incurred by its wrongful actions, provided bank/trust rightfully forgive Borrower(s) the full amount of mortgage/credit bank/trust fraudulently alleged to have given. In addition, Borrower(s) make the one time demand $1, 250,000.00 for any loss, damage, and injury he/she/they have sustained; and that bank/trust also immediately remove any/all negative comments on Borrower’s credit report attributed to this transaction.

Any default, failures, or non-compliance on the Lender’s part to perform as herein directed within twenty (20) days of receipt, shall constitute this NOTICE OF RIGHT TO CANCEL as valid and fully agreed/accepted pursuant to the terms and conditions as set forth herein.

## FORECLOSURE OFFENSE AND DEFENSE SEPARATION OF MORTGAGE NOTE

It might seem like a strange idea but it has been in the Uniform Commercial Code for Years and its predecessor. The usual rule is that the mortgage follows the note and the note follows the mortgage. But the UCC provides an exception for the operation of the parties intent, and by operation of law by inference.

Start with this Statute from Florida which has its counterpart in most of the country:

701.02 Assignment not effectual against creditors unless recorded and indicated in title of document.–

(1) No assignment of a mortgage upon real property or of any interest therein, shall be good or effectual in law or equity, against creditors or subsequent purchasers, for a valuable consideration, and without notice, unless the assignment is contained in a document which, in its title, indicates an assignment of mortgage and is recorded according to law.

So what you say? Well in most cases the note was assigned and the mortgage wasn't. At least it wasn't recorded. And in most cases as the loan moves up the securitization chain several things happens. Instead of there being a specific assignment of a specific loan, note or mortgage, there is a general description of the pool and possibly some identification of the loan date or parties but not assignment, endorsement, allonge or actual transfer.

So the first thing that happens in securitization of the loan is that the named payee on the note gets (a) paid in full and (b) paid a fee for the "rental" of its charter or license in order to facilitate an unchartered, unregistered entity or person to enter into a transaction that LOOKS like a residential loan transaction but is actually a scheme to issue unreglated securities to unsuspecting (or suspecting) investors under false pretenses. So if the loan is for $100,000, the payee on the note gets the full $100,000. Plus he usually gets $2500 "under the table" (TILA violation).

The point here is that the note is paid and without a RECORDED assignment, the mortgage does NOT travel with the note even if an assignment was intended. And the reason is the same as the reason for recording a deed. Without that requirement a person could issue

warranty deeds to 100 people on the same property. In fact, as was done in many cases with the movement of these loans, it would be the equivalent of selling the deed to the same property 100 times by a grantor who has no title.

The reason this is so important, is that if the mortgage has been severed from the note, then the obligation, if it exists at all has been converted from a secured obligation to an unsecured obligation, thus making foreclosure impossible. No mortgage can be foreclosed without the mortgagee producing the note and stating that it is in default and showing (proving) that this is so. In securitization, this is NEVER possible.

**Foreclosure Defense and Chain of Title**

**Here is where foreclosure defense can begin to chip away at a bank's claim on your property. In order for a mortgage, deed of trust or promissory note to be valid, it must have what is known as "perfection" of the chain of title. In other words, there must be a clear, unambiguous record of ownership from the time you signed your papers at closing, to the present moment. Any lapse in the chain of title causes a "defect" in the instrument, making it invalid.**

**In reality, lapses occur frequently. As mortgages and deeds began to routinely be bought and sold, the sheer magnitude of those transfers made it difficult, costly and time-consuming for institutions to record every transaction in a county records office. But in order to have some method of record-keeping, the banks created the**

**Mortgage Electronic Registration System (MERS), a privately held company that tracks the servicing rights and ownership of the nation's mortgages. The MERS holds more than 66 million American mortgages in its database.**

**When a foreclosure is imminent, MERS appoints a party to foreclose, based on its records of who owns the mortgage or deed of trust. But some courts have rejected the notion that MERS has the legal authority to assign title to a particular party in the first place. A court can decide MERS has no "standing," meaning that the court does**

**not recognize its right to initiate foreclosure since MERS does not have any financial interest in either the property or the promissory note.**

**And since MERS has essentially bypassed the county record-keeping system, the perfection of chain of title cannot be independently verified. This is where a foreclosure defense can gain traction, by questioning the perfection of the chain of title and challenging MERS' legal authority to assign title.**

**Some courts may also challenge MERS' ability to transfer the promissory note, since it likely has been sold to a different entity, or in most cases, securitized (pooled with other loans) and sold to an unknown number of entities. In the U.S. Supreme Court case *Carpenter v. Longan*, it was ruled that where a promissory note goes, a deed of trust must follow. In other words, the deed and the note cannot be separated.**

**If your note has been securitized, it now belongs to someone other than the holder of your mortgage. This is known as bifurcation — the deed of trust points to one party, while the promissory note points to another. Thus, a foreclosure defense claims that since the relationship between the deed and the note has become defective, it renders the deed of trust unenforceable.**

**Your promissory note must also have a clear chain of title, according to the nation's Uniform Commercial Code (UCC), the body of regulations that governs these types of financial instruments. But over and over again, borrowers have been able to demonstrate that subsequent assignments of promissory notes have gone unendorsed. In fact, it has been standard practice for banks to leave the assignment blank when loans are sold and/or securitized and, customarily, the courts have allowed blank assignment to be an acceptable form of proof of ownership. However, when the Massachusetts Supreme Court in *U.S. Bank v. Ibenez* ruled that blank assignment is not sufficient to claim perfection, it provided another way in which a foreclosure can be challenged.**

This is my first diary entry and I'm not going to hide the fact that this information comes from personal experience and need. When I made mortgage payments to Chase Home Finance, LLC, it claimed ownership of my mortgage note, also known as a deed of trust note, or 'loan' note (hereafter "Note"). During the same time period that Chase claimed ownership of my Note, so did Fannie Mae. However, I soon discovered that *neither* Chase nor Fannie Mae owned my Note. It was, and still is, owned by a mortgage backed security trust (MBST) which purchased my Note from neither Chase nor Fannie Mae but from yet another purported owner of my Note. In my extended diary I give the UCC statute common to *all* states and also recent case citations (one is less than two weeks old) that you, your attorney or your friend's attorney will need for a successful "show me the note" defense. Yes! It works!

You need to know this; that the term, "show me the note" is a misnomer. Under the Uniform Commercial Code (UCC), Section 309 of Article 3 (UCC 3:309) **http://www.law.cornell.edu/...** the Note owner does not need to show a Note, whether original or a copy, in order to enforce it "if" it once had possession of the Note and now claims to have lost it or that it was accidently destroyed. That, however, is not the problem that banks face. The problem banks are having with the "show me the note" defense is proving that they have a right to enforce the Note, even if they can produce a copy. The UCC, at 3:309(2), says that the bank must 'prove' its right to enforce the Note. You ask the bank, "Where did you get that Note? Show me the endorsements". The bank must show the '*chain of title*' from the original Lender bank to itself, and that it *cannot* do. Almost always, the Lender sold your Note to Fannie Mae the day it was signed which then, within days, sold it to another entity and so on until it ended up in a "mortgage backed security trust", or MBST. Fannie Mae no longer owns your Note, nor does MERS.
The United States Bankruptcy Court for the Eastern District of California issued a ruling dated May 20, 2010, in the matter of *In re: Walker*, Case No. 10-21656-E-11, **http://www.ultimatebk.com/...** stating that "Any attempt to transfer the beneficial interest of a trust deed without ownership of the underlying note is void under California law."

Though this conclusion was based upon California law it is the same UCC and real estate law as most other states have adopted. The *In re: Walker* court states that the Note and the mortgage are inseparable, and that an assignment of the Note carries the mortgage with it, "while an assignment of the latter [the mortgage] alone is a nullity" (most foreclosing companies claim ownership of the mortgage only, not the note making the mortgage a *nullity*). Meaning; if a bank claims to own the mortgage but doesn't also own your Note, it *cannot* foreclose. This concept is from ancient English Common Law codified by most states as the UCC, for Notes (a Note is personal property), and also from real estate law and practice for the mortgage ( a mortgage is not personal property, it is real property).

A more recent California case, *Gomes v Countrywide Home Loans, et al.*, D057005, Ct. Appeals CA, 4th Dist., Div One, February 18, 2011, **http://www.leagle.com/...** did not address the "show me the note" defense though it was widely expected to do so. However, in *Gomes* the CA court cited two cases approvingly where the "show me the note" defense was accepted by federal courts; *Castro v Executive Trustee Services, LLC*, (D Ariz, 2009 February 23, 2009, CV-08-2156-PHX-LOA) 2009 US Dist Lexus 14134, **http://www.leagle.com/...** and *Weingartner v Chase Home Finance, LLC*, (D Nev 2010) 702 F Supp2nd 1276, 1282-1283, **http://mattweidnerlaw.com/...** .

The CA court noted that the issue in those two cases cited in the preceding paragraph (the "show me the note" issue) was not the same issue that it had to decide in *Gomes*. In the *Gomes* case the plaintiff, Jose Gomes, did not raise the "show me the note" defense. Instead, his case was a lawsuit for *discovery* in order to find out '*if*' he could raise the "show me the note" defense. The *Gomes* court held that such a lawsuit, making '*no*' specific allegations, did not state a cause of action as a matter of law. Gomes alleged only that 'upon information and belief' MERS did not own his Note or did not have authority from the Note owner to foreclose and Jose Gomes wanted to know if his "information and belief" was true, because he didn't really *know*if it was true. The *Gomes* court, finding that Gomes made no allegation upon which it could rule, agreed with the lower court that his case should be dismissed. The *Gomes* court never addressed the "show me the note"

defense in its published opinion.

The most recent case that expounds upon the "show me the note" defense, as does *Weingartner*, continues with the reasoning made in previous court rulings made in Kansas, Ohio and Michigan and other states making ownership of your Note a requirement in order to commence a foreclosure, whether in a judicial or non-judicial state. See, Eastern District Bankruptcy Court for New York, *In Re: Ferrell L. Agard*, Case No. 810-77338, February 10, 2011 issued less than two weeks ago, **http://www.ritholtz.com/...** . In this case Ferrell Agard, the home owner, lost for reasons having nothing to do with ownership of the mortgage Note, but the Hon. Robert E. Grossman, Bankruptcy Judge, stated, **"However, in all future cases which involve MERS, the moving party must show that it validly holds both the mortgage and the underlying note in order to prove standing before this Court"**. In other words, Mr. Banker, if you want to foreclose, or file a Proof of Claim and set aside the 'stay' order that stops you from foreclosing, you must

"Prove" that you own "both" the **Mortgage Note and the Promissory Note (meaning: prove a valid "chain of title").**

# UCC Section 3-301

**UCC Section 3-301** provides only three ways in which an individual may qualify as the person eligible to enforce a note, two of which require the person to be in possession of the note (which may include possession by a third party that possesses it for the person) 19 : • The first way a person may qualify as the person eligible to enforce a note will be its "holder." This familiar concept, put down in more detail in UCC Section 1-201(b)(21)(A), requires that the person be in possession of the note and either (i) the note is payable to that person or (ii) the note is payable to bearer. Determining to whom a note is payable requires examination not only of the face area of the note but additionally of any indorsements. This is because the party to whom a note is payable may be changed by indorsement20 to ensure that, for instance, a note payable to the order of a named payee that's indorsed in blank by that payee becomes payable to bearer.21

• The 2nd way a person may be the person eligible to enforce a note will be a "Non-holder in possession of the [note] who has the rights of a holder." o Just how can an individual who is not the holder of a note have the rights of a holder?. This may occur by operation of law beyond your UCC, such as the law of subrogation or estate administration, by what type person may be the successor to or acquires another person's rights.22. Additionally it may occur if the delivery of the note to that person is really a "transfer" (as that term is defined in UCC Section 3-203, see below) because transfer of a note "vests in the transferee any right of the transferor to enforce the instrument."23 Thus, in case a holder (who, as seen above, is really a person eligible to enforce a note) transfers the note to another person, that other person (the transferee) obtains from the holder the right to enforce the note even though the transferee does not end up being the holder (as in the example below). Similarly, a 19 See UCC § 1-103(b) (unless displaced by particular provisions of the UCC, the law of, *inter alia*, principal and agent supplements the provisions of the UCC). See also UCC § 3-420, Comment 1 ("Delivery to an agent [of a payee] is delivery to the payee."). Note that

"delivery" of a negotiable instrument is defined in UCC § 1-201(b)(15) as voluntary transfer of possession. This Report does not address the determination of whether a particular person is an agent of another person under the law of agency and the agency law implications of such a determination.

20 "Indorsement," as defined in UCC § 3-204(a), requires the signature of the indorser. The law of agency determines whether a signature made by a person purporting to act as a representative binds the represented person. UCC § 3-402(a); see note 12, supra. An indorsement may appear either on the instrument or on a separate piece of paper (usually referred to as an *allonge*) affixed to the instrument. See UCC § 3-204(a) and Comment 1, par. 4.

21UCC Section 3-205 contains the rules concerning the effect of various types of indorsement on the party to whom a note is payable. Either a "special indorsement" (see UCC § 3-205(a)) or a "blank indorsement" (see UCC § 3205(b)) can change the identity of the person to whom the note is payable. A special indorsement is an indorsement that identifies the person to whom it makes the note payable, while a blank indorsement is an indorsement that does not identify such a person and results in the instrument becoming payable to bearer. When an instrument is indorsed in blank (and, thus, is payable to bearer), it may be negotiated by transfer of possession alone until specially indorsed. UCC § 3-205(b).

22 See Official Comment to UCC § 3-301. 23 UCC § 3-203(b).

Subsequent transfer will result in the following transferee being truly a person eligible for enforce the note.

23 o Under what circumstances does delivery of a note qualify as an exchange? As mentioned in UCC Section 3-203(a), a note is transferred "if it is delivered by a person apart from its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." For instance, assume that the payee of a note sells it to an assignee, going to transfer all of the payee's rights to the note, but delivers the note to the assignee without indorsing it. The assignee won't qualify as a holder (because the note continues to be

payable to the payee) but, because the transaction between the payee and the assignee qualifies as an exchange, the assignee now has all of the payee's rights to enforce the note and thereby qualifies as the person eligible for enforce it. Thus, the failure to acquire the endorsement of the payee doesn't prevent a person in possession of the note from being the person eligible for enforce it, but demonstrating that status is more difficult. The reason being the person in possession of the note must also demonstrate the purpose of the delivery of the note to it to be able to qualify as the person eligible for enforce.

24 Under what circumstances does delivery of a note qualify as a transfer? As stated in UCC Section 3-203(a), a note is transferred "if it is delivered with a person apart from its issuer for the goal of giving to the person receiving delivery the right to enforce the instrument." Like, think that the payee of a note sells it to an assignee, intending to transfer all of the payee's rights to the note, but delivers the note to the assignee without indorsing it. The assignee will not qualify as a holder (because the note is still payable to the payee) but, as the transaction between the payee and the assignee qualifies as a transfer, the assignee now has all of the payee's rights to enforce the note and thereby qualifies as the individual eligible for enforce it. Thus, the failure to obtain the endorsement of the payee doesn't prevent a person in possession of the note from being the individual eligible for enforce it, but demonstrating that status is more difficult. The reason being the individual in possession of the note must demonstrate the goal of the delivery of the note to it in order to qualify as the individual eligible for enforce.24

24 If the note was transferred for value and the transferee does not qualify as a holder because of the lack of endorsement by the transferor, "the transferee has a specifically enforceable right to the unqualified endorsement of the transferor." See UCC § 3-203(c).

25 UCC § 3-309(a)(iii) (1990 text), 3-309(a)(3) (2002 text). The 2002 text goes on to provide that a transferee from the person who lost possession of a note may also qualify as a person entitled to enforce it. See UCC § 3309(a)(1)(B) (2002). This point was thought to be implicit in the 1990 text, but was rejected in some cases in which the issue was raised. The

reasoning of those cases was rejected in Official Comment 5 to UCC § 9-109 and the point was made explicit in the 2002 text of Article 3.

26 To prevail the person must establish not only that the person is a person entitled to enforce the note but also the other elements of the maker's obligation to pay such a person. See generally UCC §§ 3-309(b), 3-412. Moreover, as is the case with respect to the enforcement of all rights under the UCC, the person enforcing the note must act in good faith in enforcing the note. UCC § 1-304. Subsequent transfer can lead to the next transferee being a person eligible for enforce the note.

**Illustrations:**

1.Maker issued a negotiable mortgage note payable to the order of Payee. Payee is in possession of the note, which has not been indorsed. Payee may be the holder of the note and, therefore, is the person eligible to enforce it. UCC §§ 1-201(b)(21)(A), 3-301(i).

2. Maker issued a negotiable mortgage note payable to the order of Payee. Payee indorsed the note in blank and gave possession of it to Transferee. Transferee may be the holder of the note and, therefore, is the person eligible to enforce it. UCC §§ 1-201(b)(21)(A), 3-301(i).

3. Maker issued a negotiable mortgage note payable to the order of Payee. Payee sold the note to Transferee and gave possession of it to Transferee for the objective of giving Transferee the proper to enforce the note. Payee did not, however, indorse the note. Transferee isn't the holder of the note because, while Transferee is in possession of the note, it's payable neither to bearer nor to Transferee. UCC § 1-201(b)(21)(A). Nonetheless, Transferee is really a person eligible to enforce the note. This is because the note was transferred to Transferee and the transfer vested in Transferee Payee's to enforce the note. UCC § 3-203(a)-(b). As a result, Transferee is really a nonholder in possession of the note with the rights of a holder and, accordingly, a person eligible to enforce the note. UCC § 3-301(ii).

4 Same facts as Illustrations 2 and 3, except that (i) underneath the law of agency, Agent is the agent of Transferee for purposes of possessing the note and (ii) it is Agent, rather than

Transferee, to whom actual physical possession of the note is written by Payee. In the important points of Illustration 2, Transferee is just a holder of the note and a person eligible to enforce it. In the context of Illustration 3, Transferee is just a person eligible to enforce the note. Whether Agent may enforce the note or mortgage on behalf of Transferee depends partly on what the law states of agency and, in the event of the mortgage, real property law.

5. Same facts as Illustration 2, except that after obtaining possession of the note, lost the note and its whereabouts cannot be determined. Transferee is just a person eligible to enforce the note even though Transferee does not need possession of it. UCC § 3-309(a). If Transferee brings an action on the note against Maker, Transferee must establish the terms of the note and the weather of Maker's obligation on it. The court might not enter judgment and only Transferee, however, unless the court finds that Maker is adequately protected against loss that may occur by reason of a state of another person (such while the finder of the note) to enforce the note. UCC § 3-309(b). 27 See *id*. UCC § 3-309(b) goes on to state that "Adequate protection may be provided by any reasonable means."

# Standing and Capacity

Standing and capacity to sue are related, but distinguishable, legal concepts (*see* *Silver v Pataki,* 96 NY2d 532, 537 [2001]; *Community Bd. 7 of Borough of Manhattan v Schaffer,* 84 NY2d 148, 154-155 [1994]; *Caprer v Nussbaum,* 36 AD3d 176, 181-182 [2006]; *Security Pac. Natl. Bank v Evans,* 31 AD3d 278, 279 [2006]). Although they are both components of a party's authority to sue (*see Matter of* *Graziano v County of Albany,* 3 NY3d 475, 479 [2004]), capacity requires an inquiry into the litigant's status, i.e., its "power to appear and bring its grievance before the court" (*Community Bd. 7 of Borough of Manhattan v Schaffer, supra* at 155), while standing requires an inquiry into whether the litigant has "an interest in the claim at issue in the lawsuit that the law will recognize as a sufficient predicate for determining the issue at the litigant's request" (*Caprer v Nussbaum, supra* at 182). Where standing is put into issue by a defendant's answer, a plaintiff must prove its standing if it is to be entitled to relief (*see* *TPZ Corp. v Dabbs,* 25 AD3d 787, 789 [2006]; *see also* *Society of Plastics Indus. v County of Suffolk,* 77 NY2d 761, 769 [1991] [standing "is an aspect of justiciability which, *when challenged,* must be considered at the outset of any litigation" (emphasis added)]).

This section is provided to provide background general information as it relates to securitization.

## Certificates relating to a securitization trust.

As detailed herein, the certificates reflected beneficial ownership interests in the trust and the supplemental interest trust. The original certificate principal balance, pass-through rates, and other features were listed in the table on pages s-1 and s-2 for the offered certificates. The certificates were issued under a pooling and servicing arrangement between a mortgage loan trust for example, as a depositor, lender, and a Bank, an Association, as servicers, and a Bank, N.A., as trustee and custodian, dated as of the closing date. All mortgage loan collections were used to pay servicer and trustee costs, premiums for lender-paid mortgage insurance, certain swap counterparty payments, and interest and principal payments on the certificates. Based on their outstanding certificate principal balances and associated entitlements, all principal collections were paid to one or more classes of certificates offered by this prospectus supplement or to other classes of certificates not offered by this prospectus supplement. Any excess collections over the amounts paid to the holders of the offered certificates (either as interest or principal), the servicers, the trustee, mortgage insurance providers, and the swap counterparty were paid to the owners of the other classes of certificates (including the class X certificates) that were not offered by this prospectus supplement and were entitled to such excess amounts. This prospectus supplement includes a "description of the Certificates-Distributions."

According to the Pooling and Servicing Agreement, the following documents were normally required to be given to the Trust for each Mortgage Loan:

(1) the associated original Mortgage Note endorsed in full or in part without recourse to the Trust,
(2) the original mortgage, as well as documentation of recording (or, if the original recorded Mortgage has not yet been returned by the recording office, a copy thereof certified to be a true and complete copy if such Mortgage was sent to for recording),
(3) an original assignment of the Mortgage to the Trust in recordable form or in blank (save as indicated below) or
(4) the originals of any agreements involving assumption, modification, extension, or guarantee.

Many of the Mortgage Loans are likely to have had mortgages or assignments of mortgages recorded in the name of an agent on behalf of the holder of the linked Mortgage Note. No Mortgage assignment in favor of the Trust had to be drafted, delivered, or recorded in those situations. Instead, each Servicer was expected to take all necessary steps to ensure that the Trust was visible to the owner of the linked Mortgage Loan on the agent's records for the purposes of the agent's system for recording transfers of beneficial ownership of mortgages. The Depositor did not plan to cause the assignments to be recorded, with the exception of assignments relating to mortgaged properties in certain states.

According to the terms of the Mortgage Loan Purchase Agreements, each Seller made or assigned to the Depositor certain representations and warranties concerning the related Mortgage Loan as of the date of (or provided in) the applicable Mortgage Loan Purchase Agreement, which generally included representations and warranties similar to those summarized in the prospectus under the heading "Description of the Agreements-Representations and warranties; Repurchase." The Depositor's rights under the Mortgage Loan Purchase Agreements were assigned to the Trust on the Closing Date for the benefit of the offered certificates' holders. Following the discovery of a breach of any representations or warranties that materially or adversely affected the interests of holders of Offered Certificates in a Mortgage Loan, or receipts of notice of such breach, the applicable seller was obligated to cure such breach or Purchase that affected Mortgage Loan from the Trust for a price equal to the unpaid principal balance thereof plus any co-payments (or, in certain circumstances, to substitute another Mortgage Loan).

Holders of the Offered Certificates suffered a loss to the extent that any Mortgage Loan for which a representation or warranty was violated was not purchased or, if authorized, substituted by the appropriate seller and a Realized Loss occurred with respect to such Mortgage Loan.

## Amendment

The Depositor, Servicers, and Trustee amended the Pooling and Servicing Agreement without the consent of certificate holders for the purposes described in the prospectus under "Description of the Agreement - Material Terms of the Pooling and Servicing Agreements and Servicing Agreements – Amendments." The Depositor, the Servicers, and the Trustee, as well as the holders of a 66 percent percentage interest in each class of certificates affected, amended the Pooling and Servicing Agreement to add to, change, or eliminate any of the provisions of the Pooling and Servicing Agreement, or modifying the certificate holders' rights in any way; provided, however, that no such amendment allowed:

1. Without the swap counterparty's approval changed the provisions of the Pooling and Servicing Agreement governing payments to the supplemental interest Trust, or otherwise had a major detrimental effect on the swap counterparty's interests (such consent was not to be unreasonably withheld)
2. Any payment needed to be distributed on any certificate has been reduced in any way, or the schedule of such payments has been delayed, without the approval of the holder of such certificate;
3. If aggregate outstanding principal amounts of certificates of each class, the holders of which were needed to consent to any such alteration, without the approval of the holders of all certificates of such class, the aforesaid percentage would be reduced.

## Section 2
## Conveyance of Mortgage Loan

The Depositor does barely sell, transfer, assign, set over, and convey to the Trust without recourse all of the Depositor's right, title, and interest in and to all of the assets that comprise the Trust Fund on or before the Cut-off Date, including all interest and principal received on or without respect to the Mortgage Loan on or before the Cut-off Date ( other than Scheduled Payments due on the Mortgage Loans on or before the Cut-odd Date), ), all accounts, chattel paper, deposit accounts, documents, general intangibles, products, instruments, investment property, letter-of-credit rights, and all earnings of the foregoing. In connection with the Depositor's conveyance of the Trust's assets, the Depositor further agrees to indicate in its books and records that the Mortgage Loans were sold to the Trustee pursuant to this Agreement on or before the Closing Date, at its own expense, and to deliver to the Trust the Mortgage Loan Schedule. The Mortgage Loan Schedule is attached to this Agreement as Exhibit B and is hereby incorporated into and formed a part of it.

The Depositor, the Servicers, the Trust, and the Trustee all agreed and understood that no Mortgage Loan should be included in the Trust, including but not limited to:

- a "High-Cost Home Loan," as defined by the New Jersey Home Ownership Act, which went into effect on November 27, 2003.
- a "High-Cost Home Loan," as defined by the New Mexico Home Loan Protection Act, which went into effect on January 1, 2004,
- a "High-Cost Home Loan," as defined by the Massachusetts Predatory Home Loan Practices Act, which went into effect on November 7, 2004, or (iv) a "High-Cost Home Loan," as defined by the Indiana High-Cost Home Loan Law, which went into effect on January 1, 2005.

1. With regard to any Mortgage Loan thus assigned that was not a Co-op Loan, the Depositor did hereby provide to, and deposit with, the custodian the following documents or instruments:
   A. The original Mortgage Note, along with all riders, was endorsed in blank or "Pay to the order of Securitization trust, without recourse." All intervening endorsements were included in the Mortgage Note, demonstrating a complete chain of title from the originator to (__________);
   B. Except as provided below and for each Mortgage Loan that was a MERS Loan, the original recorded Mortgage with all riders, with evidence of recording thereon, or, if the original Mortgage had not been returned from the recording office, a copy of the original Mortgage certified by the Transferor to the true copy of the original of the Mortgage that has been delivered for recording in the appropriate recording office of the jurisdiction in which the Mortgaged was located, noting the presence of the Loan's MIN and either language indicating that the Mortgage Loan was a MOM Loan origination, or if the Mortgage Loan was not a MOM Loan origination, the original Mortgage and its assignment to MERS, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage was recorded;
   C. The original Assignment of each Mortgage Loan that was not a MERS Loan endorsed either in blank or to "Securitization trust" in the case of each Mortgage Loan that was not a MERS Loan.
   D. The original title insurance policy (or, if the original title insurance policy has not been received from the title insurance firm, a preliminary title report, commitment, or binder);
   E. Originals of any intervening mortgage assignments, along with evidence of recording, or, if the original intervening assignment has not yet been returned from the recording office, a copy of such assignment certified to be a true copy of the original of the assignment sent for recording in the appropriate jurisdiction where the Mortgaged property was; and
   F. If any, the originals of all assumptions and modifications agree.

2. With regard to any Mortgage Loan thus assigned that was a Co-op Loan, the Depositor did hereby provide to, and deposit with, the Custodian the following documents or instruments:
   A.
   (i) (I)Either the original Mortgage Note (or a lost note affidavit with a copy of the original Mortgage Note) or
   (ii) the original consolidation, extension, and modification agreement (or a lost note affidavit including a copy of the original consolidation, extension, and modification agreement), in either case, endorsed "pay to the order of Securitization trust without recourse" or "pay to the order of Securitization trust without recourse."
   B. The Mortgagor's original Mortgage with respect to such Co-op Loan;
   C. The original Assignment of Mortgage, either blank or endorsed to "Securitization trust."
   D. Original mortgage assignments revealed a complete chain of assignment from the originator of the associated Co-op Loan to the final endorsee on the Mortgage Note;
   E. Original Form UCC-1 and any continuation statements with evidence of filling thereon (or a documented copy thereof) entered into by the Mortgagor with respect to such Co-op Loan;
   F. A completed chain of assignments from the originator of the associated Co-op Loan to the applicable Seller, with evidence of recording on Form UUC-3 (or copies thereof) by the

applicable Seller or its agent assigning the security interest covered by such Form UUC-3 (or copies thereof);

G. Original stock certificates representing the stock allocated to the related dwelling unit in the related residential cooperative housing corporation, pledged by the related Mortgagor to the originator of such Co-op Loan with a stock power in blank attached, and pledged by the related Mortgagor to the originator of such Co-op Loan;

H. The first exclusive lease;

I. The original or a copy of the proprietary lease assignment to the Trust, as well as all subsequent assignments;

J. An original or a copy of the recognition agreement for the mortgage interests in the Co-op Loan by the residential cooperative housing corporation, whose stock was pledged by the connected Mortgagor or the originator of such Co-op Loan; and

K. Originals of any assumption, consolidation, or modification agreements relating to any of the items listed in (A) through (F) above for such Co-op Loan.

If the Depositor did not deliver the Mortgage, Assignments of Mortgage, or assumption, consolidation, or modification, as the case may be, concurrently with the execution and delivery of this Agreement solely due to a delay caused by the public recording office where such Mortgage, Assignments of Mortgage, or assumption, consolidation, or modification, as the case may be, with evidence of recording thereon, if applicable, solely due to a delay caused by the public recording office where such Mortgage, Assignments of Mortgage, or assumption, consolidation, the Depositor shall deliver or cause to be delivered to the Custodian written notification that such Mortgage, assumptions, consolidation, or modification, as the case may be, has been delivered to the proper public recording office for recording.

Following that, the Depositor delivered or caused to be delivered to the Custodian such Mortgage, Assignments of Mortgage, or assumption, consolidation, or modification, as the case may be, together with evidence if a recording was indicated on the document, if applicable, upon receipt thereof from the public recording office. Any required endorsement that was not included on a Mortgage Note or an Assignment of Mortgage was created or caused to be made by the Depositor.

No Depositor, Servicer, or Trustee was compelled to permit the Assignment of Mortgage referred to in this section 2.01 to be recorded with respect to any Mortgage Loan that was not a Co-op Loan. None of the Depositors, Servicers, or Trustees were compelled to cause the Form UCC-3 referred to in this Section 2.01 to be filed concerning any Co-op Loan. If any Assignment of Mortgage referred to in this section 2.01 is not recorded or is recorded incorrectly, neither the Servicers, the Trust, nor the Custodian are liable for any failure to receive or act on such notice.

On behalf of the Certificate holders, the Trust was given ownership of each Mortgage Note, the Mortgage, and the contents of the accompanying Mortgage File. Neither the Depositor nor the Servicers took any actions that were inconsistent with such ownership, and they should not have claimed a stake in it. In response to any third-party inquiries about ownership of the Mortgage Loans, the Depositor and Servicers stated that such ownership was held by the Trust on behalf of the Certificate holders. Mortgage documents relating to the Mortgage Loan were not delivered to the Custodian and were instead held in trust by the applicable Servicer for the benefit of the Trust as the owner thereof, and the Servicer's possession of the contents of each Mortgage File so retained was solely for the purpose of servicing the related Mortgage Loan, and such retention and possession by the Servicer was solely in a custodial capacity. The Depositor committed to taking no action that would contradict the Trust's ownership of the Mortgage Loans, to notify any interested parties that the Mortgage Loans had been sold, and to claim no ownership interest in the Mortgage Loans.

The conveyance of the Depositor's right, title, and interest in and to the Trust Find pursuant to this Agreement was intended to be a purchase and sale, not a loan, as stated in this Agreement. If the transfer of

the Mortgage Loans from the Depositor to the Trust was not characterized as a sale under applicable law, this Agreement constituted a security agreement, and the Depositor was deemed to have granted to the Trust and did grant to the Trust, a security interest in the Mortgage Loans, a first priority security interest in all of the Depositor's right, title, and interest in, to, and under the Mortgage Loans, all payments of principal on or interest on such Mortgage Loans, all other rights relating to payments made in respect of the Trust Fund, and all proceeds thereof, whether now owned or hereafter acquired.

If the Trust created by this Agreement terminates before the settlement of any person's rights in any Certificates, the security interest created hereby continued in full force and effect, and the Trustee (or the Custodian on its behalf) was deemed to be a collateral agent for such person's benefit.

The Depositor did cede, assign, and set over to the Trust for the benefit of the Certificate holders its rights and interests under each sale Agreement, in addition to the conveyance made in the first paragraph of this Section 2.01, including the Depositor's right, title, and interest in the representations and warranties contained in such Sale Agreement, as well as the benefit of the repurchase obligations and the obligation of the sellers contained in the Sale Agreement to take all actions reasonably necessary to ensure the enforceability of the Mortgage Loan at the request of the Depositor or the Trust.

The Trustee hereby accepted such assignment and was entitled to exercise the Depositor's rights under each Sale Agreement as if it were the Depositor for such purposes. Except as expressly set forth herein, the foregoing Sale Agreement, transfer, assignment, set-over, deposit, and conveyance did not and was not intended to result in the Trust creating or assuming any obligation of the Depositor, the Sellers, or any other person in connection with the Mortgage Loans or any other agreement or instrument rating thereto.

## SECTION 10.03.
## Governing Law.

THIS AGREEMENT WAS CONSTRUCTED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF PENNSYLVANIA APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF PENNSYLVANIA AND THE OBLIGATION, RIGHTS, AND REMEDIES OF THE PARTIES HERETO AND THE CERTIFICATE HOLDERS SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS WITHOUT REGARD TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF.

The original Mortgage recording was frequently the only recorded document in the Chain of Title for traditional lending before Securitization. Because banks maintained the loans and did not sell them, only the original recording remains in the banks' possession.

The introduction of securitization, particularly through "Private Investors" rather than Fannie Mae or Freddie Mac, ushered in a whole new mortgage lending procedure. The Notes and Mortgages were securitized and sold once, twice, three times, or more. Using the conventional paradigm, each transfer of the Note or Mortgage of Trust would necessitate the recording of new Assignments of the Mortgage and Note. Each recording, of course, necessitated time and money.

(NOT to be confused with the sale of Servicing Rights, which is just the right to collect payments on Notes and keep a tiny fraction of the payment for Servicing Fees. When a homeowner says their loan was sold, they're usually talking about Servicing Rights.)

WACHOVIA BANK, NATIONAL ASSOCIATION originated mortgage loans as a "correspondent lender." These loans were then sold and transferred to the SECURITIZATION TRUST, a "federally-approved securitization" trust.

The Note and Mortgage had taken two distinctly different paths since Dec. 27, 2006. The Note was securitized into the SECURITIZATION TRUST. The Mortgage of the subject property still remained the same with the original lender.

The formal agreement that established the SECURITIZATION TRUST was known as a "Pooling and Servicing Agreement (PSA)" and was available on the Securities Exchange Commission's website. A "Prospectus Supplement," also available on the SEC website, explained the Trust. By its provisions, the Trust established a "CLOSING DATE" of December 27, 2006. In this situation, the promissory note was converted to trust property in accordance with the PSA's requirements. The Securities and Exchange Commission receives the Trust agreement under oath. The acquisition of the subject Trust's assets and the PSA is governed by the law.

Given the circumstances, if the Assignment of Mortgage completed after the Trust's Closing Date , would make it void since it breached the Trust instrument's specific requirements.

As required by the Pooling and Servicing Agreement, there was no record of Assignments to either the Sponsor or the Depositor.

## Securitization Summary

- There can be no legal enforcement of the Note if the Mortgage and the Note are not issued by the same organization. The Mortgage protects the lender by enforcing the Note and allowing them to foreclose on the property. As a result, if the Mortgage and the Note are separated, foreclosure is not possible. If each has a distinct mortgage/beneficiary, the Note cannot be enforced by the Mortgage, and there can be no lawful foreclosure on the homeowners' property if the Mortgage is not itself a legally enforceable instrument.
- If the loan was sold, pooled, and transformed into a security, the purported holder would no longer be able to argue that it is a true party of interest because the original lender has been paid in full.
- In addition, once the Note is changed into stock, or a stock equivalent, the Note is no longer a Note. Double dipping occurs when both the Note and the stock or stock equivalent exist at the same time. Security fraud is known as double-dipping.
- Once a loan is securitized, which the aforementioned loan may have been several times, the loan loses its security component (i.e., the Mortgage) and the right to foreclose through the Mortgage is eternally lost.
- According to the findings of this report, the Promissory Note has been permanently converted into stock. As a stock, it is subject to the SEC's laws and regulations, necessitating the completion of registration statements, Pooling and Servicing Agreements, Form 424B-5, and other documents. There is no evidence on record that the Mortgage was ever transferred simultaneously with the supposed legal transfer of the Note, such that the Mortgage and Note were permanently separated, rendering the putative security in a property null and void, as asserted.
- A thorough study and analysis found that this was a securitized debt. The Assignment of Mortgage pretended to be an A to D transaction, but the foreclosing party was concealing the true sales facts of A to B, B to C, and C to D, where A is the original lender, B is the sponsor/seller, C is the bankruptcy-remote depositor, and D is the issuing mortgage-backed securities trust. According to our findings, they also withheld the legal SEC filings that governed the transaction. True original loan Notes and Mortgages required to be given by the Document Custodian confirmed to have been in their possession on the proper dates, to be governed by those SEC filings. As a result, the Trust's claim of ownership cannot be proven, and the loan servicing rights are not established at law by agreement. The examiner provides this as written testimony, and we are available for oral testimony.

# Foreclosure Procedure General Analysis:

**The following section is provided to give a general background on procedutural foreclosure related points in certain states. The banks should follow foreclosure procedure, if they do not follow proper foreclosure procedure, then they foreclosure should be halted for improper procedural or procedural errors.**

**N.Y. C.P.L.R. § 3211**

**PROCEDURAL FORECLOSURE LAWS**

In response to the ongoing foreclosure crisis, the New York State Legislature has enacted a number of procedural and substantive protections for homeowners defending a foreclosure action involving their primary residence ( *see Independence Bank v. Valentine,* 113 A.D.3d 62, 976 N.Y.S.2d 504 [2d Dept.2013] ). Among these new protections was the enactment of CPLR 3408, which, in its original form, provided for a mandatory foreclosure settlement conference in a residential foreclosure action involving a high-cost home loan or a subprime or nontraditional home loan, as those terms were statutorily defined ( *see* L. 2008, ch. 472, § 3). The statute was later amended to apply to *all* residential foreclosure actions involving a primary residence ( *see* L. 2009, ch. 507, § 9).

The legislation also addressed the retroactivity of CPLR 3408 to ongoing foreclosure actions. Curiously, the retroactivity provisions are not located in the CPLR itself, but rather, retroactivity is addressed in an Unconsolidated Law ( *see* Hon. Mark C. Dillon, *The Newly–Enacted CPLR 3408 for Easing the Mortgage Foreclosure Crisis: Very Good Steps, but not Legislatively Perfect,* 30 Pace L. Rev. 855, 870 [2010] ). Specifically, section 3–a of the enacting legislation provided that in "any foreclosure action on a residential mortgage loan, in which the action was initiated prior to September 1, 2008 *but where the final order of judgment has not yet been issued,*" the defendant would be entitled to request a foreclosure settlement conference ( *see* L. 2008, ch. 472, § 3–a). The subsequent legislation, which expanded the applicability of CPLR 3408 to *all* residential foreclosure actions involving a primary residence, amended section 3–a by making it applicable to "any foreclosure action on a home loan, in which in which the action was initiated prior to September 1, 2008 but where the final order of judgment has not been issued" ( *see* L. 2009, ch. 507, § 10

*JP Morgan Chase Bank v. Casanova*, 980 N.Y.S.2d 746, 747-48 (N.Y. Sup. Ct. 2014)