# MERS Analysis Report
## for
# Ivan Higgs

## 54248 Kalberer Rd., Scappoose OR 97056

## Table of Contents


| Section Title | Page |
|---|---|
| MERS Screenshot | 3 |
| MERS License Fraud Analysis | 4-11 |
| Mortgage Note Considerations | 12 |

## MERS Screenshot

1

MERS®
ServicerID

1 Record Matched Your Search

MIN: **1012320-0000038766-8** Note Date: **06/26/2017** MIN Status: **Active**

Servicer: PennyMac Corp. Phone: **(866) 695-4122**

**Westlake Village, CA**

If you are a borrower on this loan, you can click here to enter additional information and display the Investor name.

Return to Search

## MERS Analysis

Mers & The Debt

MERS does record the assignment in the actual real property records system. The actual note itself, is the creation of the legal obligation to have the loan/note repaid for the debt. Thus the note is the actual legal document which backs the debt. The debt itself has not been transferred or negotiated by MERS

- MERS does record the assignment in the actual real property records system. The actual note itself, is the creation of the legal obligation to have the loan/note repaid for the debt. Thus the note is the actual legal document which backs the debt. The debt itself has not been transferred or negotiated by MERS

- MERS is not legally entitled to receive monthly payments from the borrower. MERS cannot legally be entitled to benefit from a foreclosure in any sale of the home in a foreclosure sale.

- MERS does not own the mortgage note, thus it cannot attempt to foreclose.

- MERS cannot have any legal claim or interest in the loan interest, the debt, security instrument which MERS serves as a nominee.

**MERS & Securitization**

Mortgage Electronic Registration System (MERS) has been named the beneficiary for this loan. MERS was created to reduce in need of executing and recording of assignment of mortgages, with the idea that MERS would be the mortgagee of record. This would allow "MERS" to foreclose on the property, and at the same time, it would assist the lenders in avoiding the recording of the Assignments of Beneficiary on loans sold. This helped to save money for the lenders in manpower and helped to reduce the costs of recording these notes. It was also designed to "shield" investors from liability as a result of lender misconduct regarding the process of mortgage lending.
MERS is imposed to overcome certain laws and other legal requirements dealing with mortgage loans holding an "artificial" entity. Because of designating certain member employees to be MERS corporate officers, the foreclosing agency and MERS "designated officer" has a conflict of interest. MERS and the servicer both have not a beneficial interest in the note even they don't receive the income from the payments. And actually the service employee can't sign the Assignment in the name of MERS because the Assignment execution of MERS employee is illegal. The new party has not executed the Assignment from the actual owner of the note. An assignment will result in a nullity because of a mortgage in the absences of the assignment and physical delivery of the note. It must also bear in mind that the lender or other holder of the note registers the loan on MERS. Thereafter, all sales or assignments of the mortgage loan are accomplished electronically under the MERS system. MERS never acquires actual physical possession of the mortgage note, nor do they acquire any beneficial interest in the Note.
From the beginning MERS has indicated numerous violations of Unfair and Deceptive Acts and

Practices because of conflicting nature and identity of the servicer and the beneficiary. As these practices were intentionally designed, it misleads the borrower and benefits the lenders.
So the main point becomes, is MERS the Servicer or the foreclosing party? As the Servicer is the party who initiate the foreclosure and they take the documents to their own employee who are designated as a "Corporate Officer of MERS", and who conveniently signs the document for MERS, aren't they the "foreclosing party"?

Is MERS the Beneficial Owner of the Note?

1. MERS is named after the beneficiary on the Deed of Trust and holding only legal title to the interest granted by Borrower in this Security Instrument...has the right: to exercise any or all of those interest, including, but not limited to, releasing and canceling this security instrument.
2. MERS can claim to hold the Note but it has not any actual possession of the Note
3. MERS don't get any payments or income from the monthly payments. Ultimate Investor gets this money. The Investor has the beneficial interest in the Note because the Investor receiving the payments.
4. MERS agreement indicates that MERS will comply with the instructions of the holder of mortgage loan promissory notes at all time. It also indicates that "When the beneficial owner will not give contrary instructions , MER may depends on instructions from the servicer shown on the MERS system in accordance with these rules and the procedures with respect to transfers of beneficial ownership.
5. MERS is not the beneficial owner of the note that has been testified in Florida Courts.

Assignment of Beneficiary

MERS does not keep the record of the assignment of beneficiary though it is required by law, until the foreclosure process starts and the Notice of Default has been filed, and apparently, only when it appears that the borrower will not be able to reinstate the loan and then foreclosure is inevitable. It maintains itself as the beneficiary throughout the entire process up to foreclosure.
MERS has represented in Florida Courts that its sole purpose is as a system to track mortgages. It has stated that the lenders and servicers do entry for themselves and it does not do the entries itself, but. When an Assignment of Beneficiary is executed, it is the member servicer or lender that goes to the website, downloads the necessary forms, completes the forms and then takes it to the designated "MERS officer" to sign.
MERS agreements state that MERS and the Member agree that: (i) the MERS System is not a vehicle for creating or transferring beneficial interest in mortgage loans, (ii) transfer of servicing interests reflecting on MERS System are subject to the consent of the beneficial owner.
Since MERS and the servicer both haven't a beneficial interest in the note, they don't receive the income from the payments, and since it is actually an employee of the servicer signing the Assignment in the name of MERS, this begs the question:
Is the assignment executed by the MERS employee even legal, since the actual owner of the note has not executed the assignment to the new party?
A good indicator might be in Sobel v Mutual Development, Inc, 313 So 2d 77 (1st DCA Fla 1975). An assignment of a mortgage in the absence of the assignment and physical delivery of the note in question is a nullity.

Possession of the Note & Holder in Due Course

Coming to the forefront, possession of the Note is a key argument. The foreclosing entity has to prove possession and ownership of the original Note in order to foreclose. A survey reported that upwards of 40% of the Notes are missing and cannot be found that's why this comes to the forefront. And MERS is once again involved in this.

MERS foreclosure lawsuits often include a Lost, Missing, or Destroyed Affidavit In Judicial Foreclosure states. The Note cannot be found, and that the Note prior to being lost was in the possession of MERS which was "testified" by this affidavit. This has become very problematic for MERS,As they have admitted in Courts that they do not own the Note or even hold the Note. If this is so, then MERS is likely filing fraudulent Affidavits.

When challenged, one defense that MERS uses to support its "legal standing" is that the servicer has possession of the Note and Deed. MERS, by the act of having its own "Officers" as employees of the servicer, entitles it to foreclose on behalf of the servicer and the beneficiary. When confronted with this defense, the response should be for the servicer to produce the note.

It should also be noted that the lender or other holder of the note registers the loan on MERS. Then, under the MERS system all sales or assignments of the mortgage loan are accomplished electronically. MERS never acquires actual physical possession of the mortgage note, and they don’t acquire any beneficial interest in the Note.

Securitization Process

Securitization is the name for the process by which the final investor for the loan ended up with the loan. It entailed the following:

1. Mortgage broker had client who needed a loan and delivered the loan package to the lender.
2. The lender approved the loan and funded it. This was usually through "warehouse" lines of credit. The lender most of the times used warehouse line instead using their own money and that had been advanced to the lender by major Wall Street firms like J.P. Morgan.
3. The lender "sold" the loan to the Wall Street lender, earning from 2.5 - 8 points per loan. This entity is known also as the mortgage aggregator.
4. The loan, and thousands like it, are sold together to an investment banker.
5. Securities banker buys loans from Investment banker
6. Securities banker sells the loans to the final investors, as a Securitized Instrument, where a Trustee is named for the investors, and the Trustee will administer all bookkeeping and disbursement of funds.
7. The issue with the securitization process is that when the Securitized Instrument was sold, it was split apart and sold in tranches, (in slices like a pie). There were few or no records kept of which notes went into which trancheand there are no records of how many investors bought into each particular tranche. Additionally, there were no

Assignments designed or signed in anticipation of establishing legal standing to foreclose.

8. Rating Agencies rated the tranches at the request of the Investment Bankers who paid the Rating Agencies.
9. When the tranches were created, each "slice" was given a rating, "AAA, AA, A, BBB, BB, etc. which tranche got "paid" first out of the monthly proceeds determined the ratings. If significant numbers of loans missed payments, or went into default, then the AAA tranche would receive all money due, and this went on down the line. The bottom tranches with the most risk would receive the leftover money.

These were the first tranches to fail. Even if the defaulting loans were in the AAA tranche, the AAA tranche would still be paid and the lowest tranche would not. Wall Street, after the 2000 Dot.com crash, had large amounts of money sitting on the sidelines, looking for new investment opportunities. Returns on Investments were dismal, and investors were looking for new opportunities. Wall Street recognized that creating Special Investment Vehicles offered a new investment tool that could generate large commissions.

Other Pertinent Facts of Securitization

1. In Wall Street pooling agreements they defined in the agreements that the loans that they would accept for each investment vehicle. The lenders were executed agreements by them, with the lenders and then immediately issued warehouse lines of credit to the lenders.
2. Lenders then informed brokers to know the loan parameters to meet the pooling agreement guidelines and the brokers went out and found the borrowers.
3. Wall Street took all the loans, packaged them up and sold them as bonds and other security instruments to other investors, i.e. Joe's Pension, and paid off original investors or reissued new line of credit, and earned commissions on both ends.
4. The process was repeated time and again.
5. What we do know now is that in most cases, the reality is that the reported lender on the Deed of Trust was NOT the actual lender. The actual lender who lent the money was the Wall Street Investment Bank. They simply rented the license of the lender, so that they would not run afoul of banking regulations and/or avoid liability and tax issues. For all purposes, Wall Street was the true lender and there are arguments that suggest that Disclosures should have been required naming Wall Street as the lender.

Now it can be easier to understand how possession of the Note and ownership of the Note play a vital role. In most cases, which tranche will contain any particular note, it is unknown. And will not it be known how many investors, and who bought the individual tranches without significant and time-consuming investigation.

Hence, any foreclosure that was securitized may be completely unlawful. Without the "True Owners" of the note stepping forward to demand foreclosure,

Assignee Liability

Assignee liability is another issue being contested. Under TILA and RESPA, If on the face of the loan documents gives evident that there are violations of the statutes, then assignees have a significant liability when they assume the loan. Moreover, the question arises as to if assignee liability can be claimed only if there are no violations on the face of the documents.

It is believed that MERS became the "beneficiary" for so many notes to address the Assignee Liability problem. Since MERS works as the beneficiary, and it doesn't keep the record of assignments, it becomes more difficult to determine assignee liability and holder in due course issues.

This could offer "cover" for all the parties who are participating in the Securitization process, since no there were recorded of Assignments and "proof of ownership" of the note could not be easily determined. Tracking the monthly payments made to the investors, determining which party received the monthly payment will be the only way to determined ownership of the Notes. This would be time consuming and likely only Discovery would prove the process necessary to get this information.

In Cazares v Pacific Shore Funding, CD. Cal. Jan 3, 2006, assignee that actively participated in original lender's act and dictated loan terms may be liable under UDAP.

The question then arises as to assignments further down the "chain of title". Under these circumstances, to attack the lenders, the UDAP codes can be utilized. The contracts can be "voided or rescinded for showing fraud and other causes of action, " common law and UDAP codes, especially CA B&P § 17200, and CA Civil Code §1689, which allows for contract rescission.

Litigation and major legal decisions
Mortgage Electronic Registration Systems, Inc. v. Lisa Marie Chong, et al. (United States District Court, District of Nevada)
On December 4, 2009, Judge Dawson found that "MERS provided no evidence that it was the agent or nominee for the current owner of the beneficial interest in the note, it has failed to meet its burden of establishing that it is a real party in interest with standing." He issued his decision in 5 of the 18 cases (In re Chong, In re Pilatich, In re Cortes, In Re Medina and In re O'Dell) on appeal but declined to hold that "MERS would not be able to establish itself as a real party in interest had it identified the holder of the note or provided sufficient evidence of the source of its authority."[17]
Cervantes v. Countrywide Home Loans Inc. (United States District Court, District of Arizona)
On September 24, 2009, the U.S. District Court for the District of Arizona, in Cervantes v. Countrywide Home Loans, Inc., et al., dismissed all federal and state law claims made by three borrowers in a complaint filed against a group of defendants that included MERS. The court discussed whether MERS was a proper beneficiary but only in the context of whether its involvement constituted the tort of fraud on the borrowers. The court found the mere use of MERS was not common law fraud on the borrowers, finding that "Plaintiffs have failed to allege what effect, if any, listing the MERS system as a 'sham' beneficiary on the deed of trust had upon their obligations as borrowers."[18]
The U.S. Court of Appeals for the Ninth Circuit affirmed the trial court's judgment in favor of MERS in a published opinion filed on September 7, 2011.[19] The Court ruled that a borrower had no basis to challenge the standing of an entity like MERS. It also, however, drew attention to a legal reference book's footnote that such a borrower still had a remedy by suing to have the trustee's sale set aside.
Mortgage Electronic Registration Systems, Inc. v. Revoredo, et al. (Florida Third District Court of Appeals)
Both the 3rd District Court of Appeals in Miami and the 2nd District Court of Appeals in Lakeland held that MERS can foreclose. Senior Judge Alan R. Schwartz noted the decision was based in part in the changes in finance and technology over time. "The problem arises from the difficulty of attempting to shoehorn a modern innovative instrument of commerce into nomenclature and legal categories which stem essentially from the medieval English land law," Schwartz wrote.[20]
A related Florida case is BONY Mellon v. Pino. After homeowner Pino had established that bank paperwork was defective, BONY moved to dismiss its own suit, presumably intending to remedy the paperwork and then start a second suit for foreclosure, Florida being a judicial foreclosure state. Pino challenged the bank's right to dismiss its own suit in such a way. As the case neared a hearing at the Florida supreme court, the parties settled. Days later the bank recorded notice at the country recorder that Pino was now the free and clear owner of his house. In other words, the bank let go of its claim, presumably worth many thousands of dollars, to Pino's house, because bank attorneys believed they were likely to lose at the state supreme court, and thus establish a precedent that could cost them a lot of money. Avoiding the precedent was worth more than the lost money lent to Pino. In spite of the bank's action, the court decided to hear the matter to rule on the propriety of the banks "dismiss-fix-sue again" approach. (Brittany Davis, Miami Herald blog, May 10, 2012)
Jewelean Jackson, et. al. v. Mortgage Electronic Registration Systems, Inc. (Minnesota Supreme Court)
On August 14, 2009, the Minnesota Supreme Court ruled that MERS could foreclose under state law as the mortgagee of record.[21]
A class-action lawsuit was filed by homeowners in Delaware to hold MERS responsible for fraudulent fees on foreclosures filed by MERS.[22]

Homeowners have argued in court that their homes could not be foreclosed because MERS deeds of trust were unlawful.[23] In other cases, state appellate courts have held that MERS is permitted to foreclose mortgage liens when it is the holder of the note and mortgage.

Landmark Nat'l Bank v. Kesler (Kansas Supreme Court)

On August 28, 2009, the Kansas Supreme Court in Landmark National Bank v. Kesler, 2009 Kan. LEXIS 834 (Aug 28, 2009), issued a decision involving MERS that focused on finality of judgments. MERS's involvement with this case arose from the fact that the company did not receive notice of a foreclosure action even though MERS was the mortgagee of record on a junior lien. In the opinion, the court noted that "[e]ven if MERS was technically entitled to notice and service in the initial foreclosure action—an issue that we do not decide at this time—we are not compelled to conclude that the trial court abused its discretion in denying the motions to vacate default judgment and require joinder of MERS…." The case did not affect MERS's standing to foreclose and the company is entitled to receive notice of legal actions when MERS is the mortgagee.[24] The court concluded that MERS had not publicly recorded the chain of title with the relevant registers of deeds in counties across Kansas. The judges determined that a mortgage contract consists of two documents: a deed of trust (which secures the property as collateral) and the promissory note (which indents the borrower to the lender), and determined that "in the event that the mortgage loan somehow separates interests of the note and the deed of trust... with the deed of trust lying with some independent entity... the mortgage may become unenforceable."[25]

On April 30, 2010, a Kansas appellate court in MERS, Inc. v. Graham, 44 Kan. App. 2d 547, 2010 WL 1873567, at **4-**5, interpreted Kesler to mean that MERS in fact does not have standing to foreclose on a mortgage in Kansas where there is no mention of MERS in the promissory note, MERS acts solely as a "nominee" for the lender, and there is no evidence that the promissory note has been assigned to MERS or that MERS otherwise possesses an interest in the promissory note.

MERSCORP, Inc., RESPA Litigation (United States Court of Appeals for the Fifth Circuit)

In 2008, the United States Court of Appeals for the Fifth Circuit dismissed a multi-district class action lawsuit against MERS. The plaintiffs alleged that a small fee charged by mortgage lenders, which was then paid to MERS, violated provisions in the Real Estate Settlement Procedures Act (RESPA). The plaintiffs also argued that MERS unfairly received business referrals from the mortgage lenders. However, the Circuit Judges held that "In exchange for the fee, MERS performed the service of being the permanent record mortgagee in the public land records..." Plaintiffs' complaint was dismissed by the appellate court for failure to state a claim under RESPA.[26]

District of Columbia Attorney General's Enforcement Statement

On October 27, 2010, DC Attorney General Peter Nickels issued a statement which concludes that "a foreclosuring may not be commenced against a D.C. homeowner unless the security interest of the current noteholder is properly supported by public filings with the District's Recorder of Deeds."[27] So in Nickels' view, subsequent transfers of the mortgage on MERS's records will not count unless they were also recorded in D.C.

Gomes v. Countrywide Home Loans (California Court of Appeal for the Fourth Appellate District, Division One)

On February 18, 2011, the California Court of Appeal for the Fourth Appellate District affirmed the sustaining of a demurrer without leave to amend. In an opinion by Justice Joan Irion, the court ruled in favor of MERS in two ways: (1) California's nonjudicial foreclosure statutes did not expressly or impliedly allow a lawsuit simply to determine whether the party initiating a foreclosure was authorized to do so; and (2) even if they did, the plaintiff consented to the use of MERS to initiate the foreclosure when he signed the deed of trust.[28] Gomes expressly cited to and relied upon the state supreme court's 2010 decision in Lu v. Hawaiian Gardens Casino, Inc.,[29] which clarified that a certain conservative method of statutory analysis (first articulated by Associate Justice Frank K.

Richardson in 1979 and adopted by a majority of the court in a 1988 opinion by Chief Justice Malcolm M. Lucas) applies to all California statutes, not just the California Insurance Code. Thus, if the California Legislature has not expressly written a cause of action into a statute, it simply does not exist. The Supreme Court of California denied Gomes's petition for review on May 18, 2011. Gomes' attorney then filed a petition for writ of certiorari in the U.S. Supreme Court in which he attempted to challenge MERS on vaguely articulated due process federal constitutional grounds not previously raised in the lower courts. However, he failed to challenge the constitutionality of the California rule for finding an implied cause of action, which would likely have failed anyway, as the federal rule for finding an implied cause of action is nearly identical. The high court denied the petition on October 11, 2011.

In re Agard (U.S. Bankruptcy Court, Eastern District of New York)

On February 10, 2011, the U.S. Bankruptcy Court for the Eastern District of New York considered a motion for relief from the bankruptcy stay brought by U.S. Bank as the trustee of a securitization trust. U.S. Bank claimed the right to foreclose on the debtor's mortgage in part because of purported assignment of the mortgage from MERS. The court found itself constrained by the Rooker-Feldman doctrine to give effect to a prior state-court judgment of foreclosure, but went on to consider several arguments MERS advanced about its legal status and authority, noting that it had held off on deciding dozens of additional cases until those matters were clarified. The court found that MERS had no power as an agent to assign the mortgage under its rules, its membership agreement, or the terms of the mortgage itself. The court also found that MERS had no power as the mortgagee of record to assign the mortgage: "MERS's position that that it can be both the mortgagee and an agent of the mortgagee is absurd, at best."

The court observed,

MERS and its partners made the decision to create and operate under a business model that was designed large part to avoid the requirements of the traditional mortgage recording process. The Court does not accept the argument that because MERS may be involved with 50% of all residential mortgages in the country, that is reason enough for this Court to turn a blind eye to the fact that this process does not comply with the law.[30]

Residential Funding v. Saurman (Michigan Supreme Court)

In April 2011, in Residential Funding v. Saurman, the Michigan Court of Appeals decided two consolidated cases holding that MERS did not have standing to foreclose non-judicially pursuant to MCL 600.3204(1)(d) because it did not actually own any interest in the debt.[31] The Michigan Supreme Court reversed the decision in an order November 16, 2011, finding that MERS is the owner of an interest in the mortgage because "[MERS'] contractual obligations as mortgagee were dependent upon whether the mortgagor met the obligation to pay the indebtedness which the mortgage secured." However, the court clarified that MERS's status as an "owner of an interest in the indebtedness" does not equate to an ownership interest in the note."

On November 16, 2011, the Michigan Supreme Court, understanding the urgency and potential fallout of this matter, issued a peremptory order, in lieu of granting the appeal, and reversed the Court of Appeals judgment. (Residential Funding Co, LLC v Saurman, 2011 WL 5588929 (Mich, November 1, 2011). The court agreed with the dissenting Court of Appeals opinion, "pursuant to MCL 600.3204(1)(d), Mortgage Electronic Registration System (MERS) is the 'owner . . . of an interest in the indebtedness secured by the mortgage at issue in each of these consolidated cases' because '[MERS] contractual obligations as the mortgagee were dependent upon whether the mortgagor met the obligation to pay the indebtedness which the mortgage secured.'" The Court clarified that "MERS status as an 'owner of an interest in the indebtedness' does not equate to an ownership interest in the note. Rather, as a record-holder of the mortgage, MERS owned a security lien on the property, the continued existence of which was contingent upon the satisfaction of the

indebtedness." This interest in the indebtedness . . . authorized MERS to foreclosure by advertisement under MCL 600.3204(1)(d)." (emphasis added).

The court's interpreted MCL 600.3204(1) as inclusive rather than exclusive. The court held those with an "interest in the indebtedness" includes mortgagees of record (such as MERS) and constitutes a category of parties entitled to foreclose by advertisement, along with those who "own the indebtedness" and those who "act as the servicing agent of the mortgage."

Calvo v. HSBC (Court of Appeals of California, Second District, Division Eight)

On September 12, 2011, the California Court of Appeal for the Second District said the complaint (an alleged violation of Section 2932.5 of the California Code which requires the assignee of a mortgagee to record an assignment before exercising a power to sell real property) was irrelevant as it applied only to mortgages, not to deeds of trust.[32]

Robinson v. Countrywide (Court of Appeals of California, Fourth District)

On September 12, the Fourth District Court citing its own May decision in Gomes v. Countrywide, stated that "the statutory scheme...does not provide for a preemptive suit challenging standing. Consequently, plaintiffs' claims for damages for wrongful initiation of foreclosure and for declaratory relief based on plaintiffs' interpretation of section 2924, subdivision (a), do not state a cause of action as a matter of law."[33]

Bain vs. Metropolitan Mortgage Group, Inc. (Washington Supreme Court)

In March 2012, Kristin Bain of Tukwila, WA filed suit against MERS (and a subsidiary) for foreclosing on her house without even disclosing the actual owner of her mortgage.[34]

In August 2012, the Washington Supreme Court ruled with Bain, saying that MERS was not a lawful beneficiary of her deed and did not have the right to appoint trustees. The decision states: "A plain reading of the statute leads us to conclude that only the actual holder of the promissory note or other instrument evidencing the obligation may be a beneficiary with the power to appoint a trustee to proceed with a nonjudicial foreclosure on real property. Simply put, if MERS does not hold the note, it is not a lawful beneficiary".[35]

Electronic signatures and notarizations

Because the MERS system is electronic, it depends on the electronic storage and transmission of legal documents. On the question of notarization of electronic signatures and the honoring of notarized signatures across state lines, the US House of Representatives had passed bills to legalize these steps, and in 2010 the US Senate passed the legislation without debate. However, President Barack Obama publicly opposed the legislation on October 7, 2010. As a result, the bill died, and state laws govern whether electronic signatures can be notarized or whether a notarized signature in one state must be accepted in another.[36]

Controversy

MERS generated much debate, controversy, and criticism among litigators and academics in "some of the most widely read law review articles of the past few years."[37] Dustin A. Zacks,[38] for example, criticized MERS for taking directly inconsistent positions in various courts around the country.[39] Zacks' article found favor with the Bain Court which cited him for the proposition that "MERS's officers often issue assignments without verifying the underlying information, which has resulted in incorrect or fraudulent transfers."[40] Professor Christopher Peterson[41] has similarly argued that MERS is disingenuous in simultaneously claiming to be the mortgagee and the nominee/agent of the lender or trustee.[42] Peterson likened this alleged duplicity to being akin to the two-faced Roman God Janus,[43] while Zacks compared MERS to a "creature more akin to a many-tentacled squid."[44] Peterson's articles on MERS,[45] which also criticize MERS for its allegedly harmful effect on the integrity and transparency of public recording, have been cited by countless anti-MERS litigants[46] and in decisions both adverse and favorable to MERS.[47]

Other academics have criticized MERS on the grounds that its nominal ownership of millions of home loans poses a disastrous risk for mortgage investors should MERS ever declare bankruptcy. Such a bankruptcy could mean that mortgages would "pass into the company's bankruptcy estate and become available to satisfy creditors' claims."[48] One law professor even suggested scrapping the MERS system entirely, replacing it with an entirely new national recording system.[49]

## Mortgage Note Considerations

Since MERS is connected to this mortgage. Considering all of the fraud involved with MERS, this important points/consideration must be considered.

- Original Note has been lost or destroyed
- Note and Deed of Trust have been separated
- MERS fraud involved with this loan
- The right party to foreclosure must have original note, as well as deed of trust to foreclosure, in this case no one entity does. Thus foreclosing on this property is completely fraudulent.

According to the landmark case, Glaski Vs. Bank of America. The case was determined that in order for a company/financial entity to foreclose on a property, the company/financial entity must have both the mortgage note and the deed of trust together at the time of foreclosure. On this specific loan this is not the case, and the foreclosing entity does not have bot the original mortgage note, nor the deed of trust. Hence the conclusion is that they cannot foreclose.